Decision accordingly.

---

WICKELHAUSEN a. WILLETT.

*New York Superior Court ; Special Term, March,* 1860.

PARLIAMENTARY LAW.—ARREST.—ESCAPE.

The House of Representatives has a power to institute inquiries and to order the attendance of witnesses ; and, in case of disobedience, to bring them in custody to the bar, for the purpose of examination.

If there be a charge of contempt and breach of privilege of the House, and an order for the person charged to attend and answer it, and a wilful disobedience of that order, the House has power to cause the person charged to be taken into custody, and brought to the bar to answer the charge.

Where the House has jurisdiction of the subject-matter, its determination as to the exercise of these powers cannot be questioned collaterally.

Where by the statement of facts agreed on by the parties, it is alleged that the House, in due form of law, required and caused to issue in due and proper form of law, a warrant for the arrest, the court will not regard the objection that it

is not stated that an order for the appearance of the party was first issued and disobeyed.

The arrest by the sergeant-at-arms, under a warrant from the House of Representatives, of a prisoner in custody of a sheriff, and the removal of him out of prison by virtue of such arrest, is a removal " by virtue of some writ of *habeas corpus* or rule of court, or in such other cases as may be prescribed by law," within 2 Revised Statutes, 437, as modified by chapter 390, section 2, of the Laws of 1847—providing that being out of prison in such cases is not an escape.

Trial by the court.

This was an action brought by the plaintiff against the sheriff for the escape of John D. Williamson, who had been arrested upon execution against his person, and was confined within the liberties of the jail, having given the usual bond to such sheriff.

The action was tried before Mr. Justice Hoffman, a jury being waived, pursuant to the Code.

The following state of facts was admitted for the purposes of the trial :

I. That on the 18th day of February, 1857, the plaintiff in this action recovered a judgment in the Superior Court of the city of New York, against one John D. Williamson, for the sum of $1415.97, in an action in which the said John D. Williamson was liable to arrest, and in which he was arrested under sections 179, 181, of the Code of Procedure. That a transcript of such judgment was duly filed with the clerk of the city and county of New York, and an execution against the property of said Williamson was duly issued thereupon, to the sheriff of the city and county of New York, which was duly and properly returned, unsatisfied, on the 21st of April, 1857.

II. That thereafter, and on the 18th day of July, 1857, an execution in due form against the person of the said John D. Williamson was duly issued to the defendant, James C. Willett, sheriff, as aforesaid. That pursuant thereto, the defendant arrested the said Williamson, and held and confined him within the jail-liberties of the city and county of New York, the said Williamson having given the bond entitling him to such jail-liberties, pursuant to the statute in such case made and provided.

III. That the Congress of the United States commenced its

session on the 1st Monday of December, 1857, at the seat of the Federal Government, in the city of Washington, in the District of Columbia, and continued in session until after the 4th of March, 1858.

That during such session, and on or about the 15th day of January, 1858, the House of Representatives did, in due form of law, issue its subpœna, directed to the said Williamson, and requiring him to appear and give evidence before the said House, or a committee thereof, in a matter then pending and under investigation by said House, and within its jurisdiction.

IV. That the said Williamson was then confined within said jail-liberties, as aforesaid, and did not appear in obedience to such subpœna and summons. That thereupon, and on the 1st day of February, 1858, the said House of Representatives, in due form of law, resolved, and determined, and adjudged the said Williamson guilty of contempt of the dignity and authority of the said House, in not appearing as he had been required as aforesaid, and thereupon, in due form of law, required and caused to issue in due and proper form, to its sergeant-at-arms, the person designated by law to execute the same, a warrant for the arrest of the said Williamson, and to forthwith bring him, and to have his body wherever found, before the said House, at the bar thereof, to answer the said charge, and to be dealt with according to the constitution and laws of the United States.

V. That thereupon, and in pursuance thereof, such warrant was duly and properly issued to said sergeant-at-arms, and the said sergeant-at-arms, in obedience to the requirements of the said warrant, and for the execution thereof, forthwith came to the city of New York, aforesaid, and at one o'clock in the afternoon on the 2d day of February, 1858, within the said jail-liberties, arrested said Williamson, and took him, and compelled him to go under the said warrant to the said city of Washington, and had and produced his body before the said House of Representatives, at the bar thereof.

VI. That this action was commenced on the 5th day of February, 1858, and while the said Williamson was held and detained in the custody of the said sergeant-at-arms, under said warrant, at the city of Washington, aforesaid, and without the liberties of the said jail.

VII. That as soon as the said Williamson was released from the custody of said sergeant-at-arms, and on the 9th day of February, 1858, he returned to the liberties of the said jail.

VIII. That the said Williamson was so out of such jail-liberties as aforesaid, without the assent and against the will of the plaintiff in this action. That the plaintiff has paid to the defendant, sheriff as aforesaid, the sum of twenty dollars, as poundage, upon said last-mentioned execution.

IX. The defendant in this case claims that he is, in addition to the aforesaid matters, entitled to prove the insolvency of Williamson, as set up in his answer. The plaintiff denies that any evidence of insolvency is admissible for any purpose; but if the court shall deem the evidence competent and proper, the plaintiff admits that Williamson, at the time of his arrest under the warrant, was, and ever since has been, insolvent, and wholly irresponsible, and without means to pay any part of the said judgment upon which said execution was issued.

X. Also, under a similar claim and objection, the fact is admitted, that Williamson objected to accompany the officer who held the warrant, because of his being held under the bond aforesaid.

*E. L. Godkin*, for the plaintiff.

*A. J. Vanderpoel*, for the defendant.

HOFFMAN, J.—The question is, whether the forcible arrest of Williamson, defendant in the action of the present plaintiff, by the sergeant-at-arms, and compelling him to go to the city of Washington, under the warrant of the Speaker, forms a defence to the sheriff, defendant in this action for an escape? Williamson had been subpœnaed to give evidence before the House of Representatives, or a committee thereof, in a matter then under investigation, and within its jurisdiction. He did not appear in obedience to that summons. He was, in due form of law, adjudged guilty of contempt, and thereupon the House, in due form of law, caused a warrant to be issued to the sergeant-at-arms, the proper officer to execute the same, for his arrest, and to have his body before the House, at the bar thereof.

It is insisted that neither branch of the Congress of the United

States has the power of compelling the attendance of witnesses, at least from beyond the District of Columbia; that it can do no more than request their appearance, and its summons is but a solicitation; that as no power of compelling an appearance exists, no right to inflict punishment for disobedience can be supported.

If this is true, the defence to the present action is untenable. The process was utterly void. The sheriff was entitled or bound to resist it. The defendant in the action, the witness summoned, could have met force by force. It was as illegal an act, on the part of the sergeant-at-arms, as the violence of the mob in Lord Gordon's riots; and an escape in the legal sense would be made out.

I shall examine this proposition, *first*, upon the general doctrines of analogous law; and *next* (if then found necessary), upon the peculiar law which constitutes and regulates the Congress of the United States.

No view of the subject can be comprehensive or satisfactory, which does not include a notice of the law of the Parliament of England, and the influence of that law in our Colonial polity.

That the Parliament was, in its origin, a court of justice, is a fact warranted by history; and this principle pervades and expands the exercise of its authority to this day. The Saxon Council, from which it sprung, embodied in itself the supreme judicial as well as legislative power of the Saxon government. (*Edmund Burke's Abrid. of Eng. History*, 460, vol. v., Am. ed. of 1813; *Palgrave's Eng. Commonwealth*, vol. ii., 314, 634, 635; *Turner's History of England during the Middle Ages*, vol i., 416.)

In Atwyll's Case (17 ed., 4) the petition of the Commons speaks of his Majesty's lieges, "called by your Highness's authority to this your *High Court of Parliament* for the shires, &c., of this your realm."

Lord Coke declares that the *High Court of Parliament* has its own peculiar law, called the *Lex et consuetudo Parliamenti*. (4 *Inst.*, 15.) This is repeated by Sir William Blackstone, and Sir Matthew Hale. (*Comm.* i., 160, 163; *On Parliaments*, 49.)

In Howard *a.* Gossett (10 *Adol. & Ell. N. S.*, 411), the phrase " either branch of the High Court of Parliament," is

used in reference to a warrant of the House of Commons; and in Reilly *a.* Carson (4 *Moore's Priv. Council R.*, 89), it is said, " The *Lex et consuetudo Parliamenti* forms part of the common law of the land ; according to which the High Court of Parliament before its division, and the Houses of Lords and Commons since, are invested with many peculiar privileges, that of punishing for contempt being one."

The elements and principles of a parliamentary law were brought into the colonies, and became attributes of the power and constitution of assemblies, wherever they were formed upon the model of Parliament. In Virginia, in 1718, the Assembly concluded itself entitled to all the rights and privileges of an " English Parliament," and the records of the House of Commons were searched for precedents. (*Bancroft's Hist.*, vol. iii., 27.) In New York, besides the authority of the historian Smith, a lawyer of eminence (vol. i., 239), the journals of the Assembly abound with instances of the assertion of the general parliamentary rights and privileges, and especially of punishing contempts of its dignity or authority.

At the commencement of every session a committee of privileges and elections was appointed, and authorized to send for persons, papers, and records. (See the *Journals passim.*) Special committees were armed with the same power. (*Journal*, vol. ii., 120, 225, 228.)

On the 14th of April, 1691, the sergeant-at-arms was ordered to take a sheriff into custody for arresting an elected member upon civil process. The warrant is set forth. (Vol. i., 4.) George Webb was taken into custody for insulting, and R. Richards for assaulting a member. (*Ib.*, 406, 419.)

In November, 1753, Hugh Gain was ordered to attend the House on account of a prohibited publication, and was brought up and reprimanded. In October, 1756, Parker and Weyman were taken into custody by the sergeant-at-arms, for publishing a paper reflecting on the House. Watkins being discovered to be its author, was arrested by the sergeant. It was resolved that he was guilty of a high misdemeanor, and he was committed to the custody of the sergeant. He apologized, and was discharged on payment of fees.

A similar course was pursued with Samuel Townsend. (Vol. ii., 554.)

In the Documentary History of New York (vol. iii., 534, 537), we find the case of McDougall, in 1770, 1771. He published a libel upon the House; was adjudged guilty of a misdemeanor; was arrested and brought to the bar. His defence was voted a contempt, and he was sent to jail. A writ of *habeas corpus* was sued out of the Supreme Court, and the return was, a commitment by virtue of a warrant of the Speaker for a contempt of the authority of the House. This was in December, 1770, and he remained imprisoned until March 4, 1771, when the Assembly was prorogued.

There can be no doubt that he was remanded on the *habeas corpus.*

It is true that in Reilly *a.* Carson (4 *Moore's Pr. C. Ca.*, 89), it was held, that a legislative assembly, created by a commission from the crown, which did not confer the power to commit for a contempt, could not do so, except for offences committed in its presence. Such a power was not a necessary attribute of the legislative capacity thus constituted; and the language used in Beaumont *a.* Barrett (1 *Ib.*, 80), and by Lord Ellenborough in Burdett *a.* Abbott (14 *East. R.*, 151), was admitted to be erroneous.

Whatever may be the rule, when an assembly acts upon a commission from the crown, recognized as the only source of its creation and its power, it is certain that the assemblies of the colonies placed their authority and its extent on a very different footing. That the people had a right to be represented in an assembly, and did not enjoy this right through the grace of the crown merely, was a fundamental doctrine. The remarkable Charter of Liberty, granted to the inhabitants of New York in 1683 (2 *Rev. Stat.*, 1813), embodied this principle. It was repeated in the important act in 1691, declaring the rights and privileges of their majesty's subjects within the province of New York. It is found in the address of the Assembly of 1704; in the resolves of 1711, declaring the inherent right of the people to dispose of the money of the freemen of the colony, which does not proceed from any commission, but from the free choice and election of the people (*Smith's History of New York*, vol. i., 132); and is constantly asserted throughout the struggles between the governors and assembly in our colonial days. " The usage, custom, and practice of the realm of Eng-

land," "the laws of England," are perpetually recognized as the rules of the assembly and the law of the colony. Thus asserting, in matters of legislation, powers coequal in most particulars with those of an English Parliament, the assembly claimed a right to the possession of the authority vested in that Parliament, for carrying out the great objects of legislation. It adopted and acted upon the doctrine " that the law of Parliament was parcel of the law of England," was part of the inheritance of Englishmen, brought with them to the colonies, and as fully in force as the common law which accompanied their migration. (See also *Pownall's History of the Colonies*, 10 ; *Clark's Colonial Laws*, 435 ; *Edward's History of the West Indies*, vol. ii., 344.)

The powers thus asserted and exercised by these colonial bodies, fell, by a natural descent, upon the various legislatures of the States which succeeded them ; and the argument which this review presents to my mind is of unanswerable force. There is a presumption of the existence, in the separate legislatures, of this inherited authority and right, and express constitutional restrictions must be found to avoid or impair it.

· By the constitution of the State of New York, of April, 1777 (Art. ix.), it was declared that, "the Assembly shall enjoy the same privileges, and proceed in doing business in like manner, as the assemblies of the colony of New York of right formerly did."

The constitution of 1821 (Art. i. and iii.), omitted this clause— providing merely that each House shall determine the rule of its own proceedings. The revisors of 1830 say : " It is believed that the omission of these words, in the amended constitution, was not intended to deprive, and could not have the effect of depriving, the two Houses of the Legislature of the indispensable power of punishing for a contempt." (*Notes, Appendix* 3, vol. ii., 2d ed.) They submitted an act, which still remains in force, defining the powers of the Legislature, and specifying the privileges, the breach of which may be punished by imprisonment. The refusal to attend and be examined is one of the cases enumerated. (1 *Rev. Stat.*, 1830, 154, § 13.) Another statute regulated the mode of taking testimony. (*Ib.*, 158.)

The constitution of 1846 is the same in the particular referred to as that of 1821.

In 1824 (of course under the constitution of 1821), William Caldwell refused to give evidence before a committee of the Assembly, upon the investigations relating to the alleged Chemical Bank frauds. Ambrose Spencer was his counsel. He was committed to the Albany county jail; a committee of the Senate requiring his evidence while thus imprisoned, on request of the Senate, the House allowed his attendance.

The House, after he had been brought before it and been heard, " *Resolved*, That there was no sufficient ground for his refusal to appear before the committee, and testify; that he was guilty of a misdemeanor and contempt of the House; that the sergeant-at-arms deliver him to the keeper of the jail of the county of Albany; that he be imprisoned until the further order of the House, and that the Speaker issue his warrant accordingly." (*Journal Ass.*, Nov. 17, 1824.)

In 1837, this subject was examined before the House of Assembly in the case of Slamm and Jaques. The following is an abstract of the report of the committee of the 10th of May, 1837. (*Document 327 of Assembly*.)

It recites a subpœna issued to Slamm and Jaques, to appear and testify before a committee. Upon proof of service and a refusal, an attachment was issued by order of the House, and they were brought up by the sergeant-at-arms. After a vote of the House they were reprimanded by the Speaker. They then appeared before the committee, and refused to be sworn, on the ground of the want of a constitutional authority to compel them to appear and testify. By order of the House, the sergeant-at-arms arrested them. The committee cite Burdett *a.* Abbott (14 *E. R.*), and Anderson *a.* Dunn (6 *Wheat.*, 204). They say: " The power of judging of qualifications, presupposes the right to issue subpœnas, which would be nugatory if no power exists to enforce obedience. The same reasoning applies in all cases where the nature of the duty to be performed by the House requires the attendance of witnesses. This power is clearly authorized by the constitution of the State and the United States, is in conformity with the law of the land, and the well-settled usages of legislative bodies in all enlightened nations."

I may add here the able opinion of Mr. Justice Daly in Briggs *a.* Mackellar (2 *Abbotts' Pr. R.*, 30), recognizing the power as part of the law of our legislative bodies.

Has the constitution of the United States, or any other law, placed either branch of the Congress of the United States in a different position as a legislative assembly, and forbidden it the exercise of this ordinary power? It might be sufficient to refer to the case of Anderson *a.* Dunn (6 *Wheat.*, 204), as covering the question. A decision that the authority can be exerted upon a person not a member, to take him into custody, and restrain his liberty for contemptuous conduct, is a stronger position than is necessary to sustain the privilege in this instance.

In my opinion, the legality of the proceeding in question here may be rested upon principles which cannot be shaken. The government of the United States is supreme within its sphere of action. It is the government of the people, and emanated from them. Its powers were delegated by all, it acts for all, and it represents all. What is thus true of the aggregate, is true of each component part of that government in its appropriate sphere. What is necessary to enable either branch to fulfil its functions and discharge its duties, is impliedly vested in that branch by the will of the people. " What is necessary does not import an absolute physical necessity, so that one thing cannot exist without the other. It stands for any means calculated to attain the end, appropriate and plainly adapted to it, and not prohibited."

Now, the power of investigation through a committee is essential to wise legislation. The power to call for information from others, flows from this necessity. Hence the old formula of authority to send for persons and papers. But to rob the process of such a committee of all compulsory effect, to reduce it to a request, to deny all means of enforcement and all power to punish for disobedience, would be to render inquiry often fruitless, to exclude sources of information, and to impair or defeat the objects of legislation.

In my judgment, neither branch of Congress has the right to disclaim the power I deem it to possess, and which in this instance the House of Representatives has exercised. It is a power clothed with a trust, and vested for the fulfilment of a trust. It is identical with, or manifestly important to the discharge of, that trust. It cannot be renounced without impairing the means of duly executing the office committed to the body, and, therefore, may not be relinquished without a breach of duty.

The possession of the authority in question is vindicated by the ablest of our jurists and commentators. Chancellor Kent treats it as undeniable. (*Com.*, vol. i., 236.) Justice Story reasons upon it with his usual fulness and force, and cites examples of its exercise. (*Com.*, vol. ii., 305, 317. See, also, *Rawle on the Constitution*, ch. 4, p. 48.)

I refer also to the act of Congress of May 3, 1798, by which authority is conferred upon the president of the Senate, and other officers, to administer oaths to witnesses in cases of examinations before committees or otherwise.

Since the argument of this cause, the Senate of the United States has, in the case of Thaddeus Hyatt, claimed and insisted upon the right in question. He had been summoned to attend as a witness before a committee of the Senate. Upon his refusal to attend, the committee reported, and a warrant was, by order, issued, signed by the vice-president, directing the sergeant-at-arms to arrest him. Under this, he was brought before the Senate, and his defence, consisting of an argument against the jurisdiction of that body, was read. He was remanded to the custody of the sergeant-at-arms, time being taken for consideration. On a subsequent day (March 12, 1860), the subject was discussed at length, and a resolution that he be committed until he should appear and submit to an examination was adopted by a vote of 40 to 10.

But the occasional dissimilarity of our legislative bodies from the Parliament of England, and especially the prevalence of written constitutions, has modified and affected the parliamentary law in various particulars and to a considerable extent, and in none more so than in the theory which regards the Parliament as a court of justice.

One of the most prominent and important of the principles of our government is to keep, by written definitions and boundaries, the great departments distinct. No greater improvement has, perhaps, been made in government than to separate the judiciary from the executive and legislative branches. It is the glory of the British constitution to have led in the establishment of this most important principle. "The next equally grand and equally clear doctrine of our polity is, that the ultimate power of interpreting and applying laws, of judging of their validity, of enforcing their provisions, and arresting or punish-

ing their violation, is vested in the judiciary. It is the theory and plan of the constitution to restrain the Legislature as well as other departments, and to subject their acts to judicial decision, wherever it appears that such acts infringe constitutional limits." (*Daniel Webster; The Federalist*, No. 78; and United States *a.* Dickson, 15 *Pet.*, 141.)

It would be inaccurate, and convey a false notion of our legislative assemblies, to speak of them as courts of justice. It is accurate and legal to say, that they exercise some of the functions, employ some of the agencies, and are endued with some of the powers of courts of justice. In what cases and to what extent such powers may be legally exercised, is a point probably incapable of being logically defined, and which it would be presumptuous to attempt to define. One great principle, which pervades and illumines our whole system, will serve as a guide and a limit. Those powers are vested, by the principles of the common law itself, which are necessary to the existence of such a body, and the proper exercise of the functions which it is intended to execute.

It follows, from these views, that all the asserted powers of Parliament to interdict the prosecution of actions for the invasion of personal liberty—all the claim to punish for disobedience to such an interdict, are repugnant to our constitutional system and illegal. The House of Commons has declared judgments in the King's Courts, upon a question of privilege, unlawful. It has committed judges for giving judgment in such an action, and parties and their attorneys to Newgate for commencing them. (See *May on the Law and Practice of Parliament*, ch. 6, 143.)

All this is unwarranted and illegal. In short, the rule for our guidance cannot be better expressed than in the language of Justice Patterson, in Stockdale *a.* Hansard (9 *Adol. & Ellis*, 1), and of Justice Coleridge, in Howard *a.* Gossett (10 *Adol. & Ellis*, *N. S.*, 386.) "If the orders of the House of Commons be illegal, and not merely erroneous, upon no principle known to the laws of this country can those who carry them into effect justify under them. The mere circumstance that the act complained of was done under the authority and order of the House of Commons cannot of itself excuse the act, if it be in its nature illegal; and it is necessary, in answer to an action for such ille-

gal act, to show, not only the authority under which it was done, but the power and right of the House of Commons to give such authority."

It is enough to say that the law is supreme over the House of Commons, as over the crown itself. If the limits of the law be passed by either, they are, indeed, for the most satisfactory reasons, themselves irresponsible; but the law will require a strict account of the iracts in the persons of their agents; and these, according to the nature of the illegality, will be answerable civilly or criminally.

The right of courts of justice to pass upon the proceedings of either House in these matters upon a *habeas corpus*, or in an action properly raising the question, is therefore indisputable. The proposition of counsel in Stockdale *a.* Hansard that the officer, being an officer of the House of Commons, is protected by the order of the House directing him to do the identical act complained of, and that such order is, of itself, and without more, an answer to the action, is not the law of our country; and this proposition the Court of Queen's Bench deliberately and unanimously denied (10 *Adol. & Ellis*, 405); and the Court of Exchequer Chamber did not pass upon it, finding it unnecessary.

I feel myself, therefore, warranted and bound to examine and determine every point which may be urged against the legality and form of this proceeding.

And, *first.* I hold, in the language of the Court of Exchequer Chamber, in Gossett *a.* Howard (10 *Adol. & Ellis, N. S.,* 411), " that the House has a power to institute inquiries, and to order the attendance of witnesses; and in case of disobedience, bring them in custody to the bar, for the purpose of examination. That if there be a charge of contempt and breach of privilege, and an order for the person charged to attend and answer it, and a wilful disobedience of that order, the House has undoubtedly the power to cause the person charged to be taken into custody, and to be brought to the bar to answer the charge; and further, that such House, and that alone, is the proper judge when those powers, or either of them, are to be exercised."

I accede to the last clause of this proposition, when (as in the case stated in the first clause of a requisition for the attendance of witnesses) the fact of the jurisdiction of the subject-matter

is undeniable. When the question is settled in the mind of the judge, that the action in question was with the authority of law to exercise a portion of judicial power, and expresses a judicial determination on the matter and as to the party, then the decision cannot be questioned. Its correctness is not open for revision in any way but by a review, when one is allowed. It is binding as the judgment of a competent tribunal, until so reversed. (Wilcox *a.* Jackson, 13 *Pet.*, 511 ; The State of Rhode Island *a.* The State of Massachusetts, 12 *Ib.*, 718 ; The People *a.* Sturtevant, 5 *Seld.*, 266.)

*Next.* That if, by a regular practice, an order of the House should be made to precede and direct the issuing of a warrant, then the fourth article of the statement of facts, that the House in due form of law required and caused the issue of the warrant, removes the objection.

*Next.* That the warrant may justly be considered as having expressed on its face the cause of the arrest, viz., the failure to appear as had been required ; but if this were otherwise, the rule is placed beyond all question, that an adjudication of a contempt having been committed, is sufficient. (Burdett *a.* Abbott, 5 *Dow P. Ca.*, 199 ; Gosset *a.* Howard, *ut supra;* Anderson *a.* Dunn, 6 *Wheat.*, 204.) It is presumed, with respect to such writs as are actually issued by superior courts, that they are duly issued, and in a case in which they have jurisdiction, unless the contrary appears on the face of them.

*Again.* The course of practice which has been pursued, if erroneous, can only be treated as an irregularity, and cannot affect the material questions in the case. It seems, from the statements of the practice in the Treatises of Messrs. May & Cushing, that the course in England is, where the witness is in the custody of a keeper of a public prison, to order the keeper to bring him up. Such order is followed by the Speaker's warrant, served by a messenger upon the keeper. (*May's Law and Pr. of Parliament*, 306, 307 ; *Cushing's Law and Pr. of Leg. Ass.*, 948.)

The ordinary course of a court of justice to obtain the attendance of an imprisoned witness, is by a *habeas corpus*, and *testificandum.* (*Greenleaf's Ev.*, vol. i., 312 ; 2 *Rev. Stat., N. Y.*, 559.)

By the Judiciary act of 1789, the courts of the United States

can issue such a writ for prisoners in jail for the purpose of testifying. (Ex-parte Dorr, 3 *How. U. S. R.*, 103.)

That some questions may arise of embarrassment respecting the mode of proceeding, is probable, but the present case is, I think, free from them. The defendant in the action was taken by the regular officer of the House, and returned to the liberties as soon as released. It may be either assumed that this was with the consent of the sheriff, and there was a continued constructive possession of the person in him, if he could be deemed the officer to execute the process, or that his surrender of the person to the sergeant was warranted, because the latter was the proper officer.

It remains to be considered, whether the particular law of escape creates such an exception to the exercise of the power in question as leaves the sheriff liable. If there is a power in the House to call for the attendance of witnesses out of the county, the interruption of the imprisonment, if there is any, is no greater than when the party is taken upon the subpœna from a court out of the county. (18 *Johns.*, 48.)

A striking precedent is to be found in the valuable work of Mr. Cushing (p. 760, citing Hansard (1) xxxiii., 883). A select committee, appointed to investigate complaints respecting the prison of Lincoln castle, with power to send for persons, papers, and records, having found it necessary to examine witnesses on the spot, and doubting whether their warrant to the sheriff to bring up the bodies of those under his charge would protect him against actions of escape, made a special report to the House for its advice. The House, entertaining no doubt, recommitted the report.

The statute of our State "of Escapes and the Liabilities of Sheriffs therefor" (2 *Rev. Stat.*, 437), as modified by the act of 1847 (ch. 390, § 2), contains the exceptions, "When the prisoner is at large out of prison by virtue of some writ of *habeas corpus* or rule of court, or in such other cases as may be provided by law." If the views I have taken are correct, the being out of the prison was upon process equivalent to a *habeas corpus*, or in a case provided for by law.

The judgment must be for the defendant.