## Court of Appeals.

*October*, 1885.

## PEOPLE *ex rel.* McDONALD *v.* KEELER.

(Reversing 2 *N. Y. Crim. Rep.* 141.)

CONSTITUTIONAL LAW.—REFUSAL OF WITNESS TO TESTIFY BEFORE
LEGISLATIVE COMMITTEE.—CONTEMPT.—1 R. S. 154, § 13.
—PENAL CODE, §§ 69, 719, 724.

The provisions of the Revised Statutes (1 R. S. ch. 7, tit. 2, 154, § 13),
enumerating what acts are punishable as contempts of the legis-
lature—among others, the refusal to "attend or to be examined as a
witness either before the house, or by a committee to take testimony
in legislative proceedings,"—were not superseded by the Penal Code.
This section of the Revised Statutes is constitutional and valid.

" Due process of law " does not mean according to the course of the com-
mon law.

Notwithstanding the division of the executive, legislative and judicial
powers, certain powers in their nature judicial are by the express
terms of the constitution vested in the legislature.

The power of obtaining information for the purpose of framing laws is one
that from time immemorial has been deemed necessary, and has been
exercised by legislative bodies, and in this State is expressly conferred
by statute (1 R. S. 158, §§ 1, 2).

A witness who is being examined before a committee of the legislature in
a legislative proceeding, in an investigation which the legislature has
a right to make, and who refuses to be further examined, and leaves
the presence of the committee without its consent, is guilty of con-
tempt under the Revised Statutes.

A witness before such a committee has not the right to the aid of counsel.

An investigation instituted for the mere sake of investigating, or for a
political purpose, not connected with intended legislation or with any
other matter upon which the legislature can act, is not a legislative
proceeding, and does not give the legislature jurisdiction to compel
the attendance of witnesses, or punish them for refusal to attend.

The action of the legislature,—*e. g.,* in an investigation of a public depart-
ment,—is presumed to have a legitimate object if it can be so construed.

APPEAL by the respondent from a judgment of the Gen-
eral Term of the Supreme Court in the Third Department, of

May, 1885, reversing the order of the Albany Oyer and Terminer.

The facts appear in the opinion.

For points of counsel see 2 *N. Y. Crim. Rep.* 141.

*N. C. Moak*, for Keeler, appellant.

*B. F. Tracy* and *F. W. Whitridge*, for the Senate.

*Thomas C. E. Ecclesine* and *Hamilton Harris*, for McDonald, relator.

RAPALLO, J.—The return to the writ of *habeas corpus* in this case showed that the relator was held by the sheriff in his custody by virtue of a commitment issued by the president and clerk of the senate of this State on February 28, 1884, a copy of which commitment was annexed to the return.

This commitment recited in part the proceedings leading to its issuance, and the relator put in a traverse to the return, setting forth such proceedings in full and in detail. The case was heard before the court of Oyer and Terminer of Albany county upon the petition for the writ of *habeas corpus*, the writ, the return thereto, and the traverse to such return, and it was thereupon ordered that the proceedings be dismissed and the relator remanded to the custody of the sheriff. 2 *N. Y. Cr. R.* 82. On appeal to the General Term this order was reversed, and the relator was discharged from imprisonment. 2 *N. Y. Cr. R.* 141.

From the return and traverse and the recitals contained in the resolutions therein set out, it appears in substance that charges of fraud and irregularity having been made by the public press and others against the commissioner of public works in the city of New York, the senate, on January 14, 1884, adopted a resolution directing and empowering its standing committee on the affairs of cities to investigate the department of public works in said city, with power to send for persons and papers and to report the result of such investigation and its recommendations concerning the same, to the senate; that the relator, being summoned to appear and testify before such committee,

attended, and, after having been examined at considerable length, declined to answer certain questions propounded to him by the committee, and refused to be further examined, and retired from the presence of the committee without their permission.

These facts having been reported by the committee to the senate, that body on February 25, 1884, directed its president to issue his warrant to the sergeant-at-arms, commanding him to arrest the relator and bring him before the bar of the senate to answer why he should not be punished as guilty of a contempt of its dignity and authority. A warrant having been accordingly issued, the relator was, on February 27, 1884, brought before the bar of the senate and arraigned by its order, for a breach of its privileges in disobeying a subpoena issued by its committee on cities, to appear before said committee and give testimony upon an investigation then pending before it, and in refusing to answer proper questions put by said committee, and in refusing to be further examined before said committee, and he was thereupon called upon for his answer to the charge. He requested to answer by counsel, which request was granted, and after counsel had been heard in his behalf, a resolution was adopted requiring the committee on cities to report all the testimony and proceedings had by the committee in relation to the relator, on the following day. On February 28, the report was presented, and was afterward, by a resolution, made a part of the record in the further consideration of the case. From this report it appears that the relator was allowed to be attended and advised by counsel, during his examination before the committee ; that on various questions being propounded to him, he was instructed by his counsel not to answer, and then, being required by the committee to answer them, he declined to do so on the ground of the advice of his counsel. After numerous refusals to answer of this description, the committee, on motion, directed that its chairman no longer recognize the right of the witness to have any counsel present. Thereupon the counsel instructed the witness to withdraw from the committee and leave with him. The chairman stated to the witness that if he did, it would be at his peril, and he replied, that he took the peril of it. He was informed that his examination was not

concluded, and was advised by the chairman not to leave, and the witness replied that he would take the consequences.

This report of the committee having been presented to the senate, on the hearing before it, on February 28, the relator, on that day, presented to the senate his affidavit, in which he alleged that he was advised and believed that he was entitled in any examination held by said committee, to the benefit of the advice and assistance of counsel, as a matter of right and not of courtesy, and that he was advised and believed that the questions he refused to answer, under the advice of counsel, were improper and immaterial, in that they sought to elicit facts touching his private business, apart from his connection with the department of public works, into which said committee had no authority or warrant of law to inquire, and that he was prepared then to attend before the committee, accompanied by his counsel, and subject to his advice, to answer all proper and material questions which the committee were authorized by law to ask.

The relator being again brought before the bar of the senate and asked by the president whether he was willing to appear before the committee and answer the questions which he had refused to answer, he replied that he would not do so by the advice of counsel. The senate, thereupon, on February 28, 1884, adopted a resolution as follows : " *Resolved*, that William McDonald is declared to be in contempt of the senate for refusing to answer as a witness pertinent questions, propounded by the standing committee on cities, in the investigation of the department of public works of the city of New York, and for quitting the presence of the committee pending his examination as a witness."

Being again brought to the bar and asked the same question as before, he answered in writing that he was willing to appear before the committee and answer all proper and material questions, if allowed the advice and assistance of counsel. Thereupon the senate adopted the following resolution : "*Resolved*, that William McDonald, having been declared to be guilty of a contempt of the senate, and being convicted thereof, for refusing to answer, as a witness, pertinent questions propounded by the standing committee on the affairs of cities of the senate,

in the investigation of the department of public works of the city of New York, and being summoned as a witness and appearing before the committee, for refusing to submit to an examination as a witness before such committee on the subject of said investigation, and quitting the presence of said committee, be and hereby is remanded into the custody of the sergeant-at-arms, and is hereby sentenced to be, by said sergeant, imprisoned in the county jail of Albany county, there to remain until he shall consent to appear before the standing committee on the affairs of cities, as a witness, and answer the questions put to him by the said committee in the matter of said investigation, said imprisonment, however, not to extend beyond the final adjournment of the present legislature. And the keeper of the said common jail of the county of Albany is hereby commanded to receive said William McDonald and him safely keep and imprison in said jail until the adjournment of the present legislature, unless sooner discharged by order of the senate."

In pursuance of this resolution the commitment in question was issued by the president and clerk of the senate, and directed to the sergeant-at-arms and the sheriff of the county of Albany, and the relator was accordingly imprisoned in the county jail.

The broad ground is now taken on the part of the relator, that the senate had no jurisdiction or power to adjudge him guilty of the contempt with which he was charged, or to imprison him therefor. It is needless to enter upon the discussion of the proposition, urged on the part of the appellant and disputed by the respondent, that the power to commit or punish for contempt, which has been exercised by parliament in England, is vested in the senate and assembly of this State, either by virtue of our adoption of the common law of England, or by reason of such a power being inherent in legislative bodies; for, since the year 1830, the whole subject has been regulated in this State by statutory provisions which, if constitutional, must control. Title 2, chapter 7, part 1 of the Revised Statutes, entitled "Of the powers, duties and privileges of the two houses and their members and officers," provides as follows: "Section 13. Each house has the power to

punish as a contempt and by imprisonment a breach of its privileges, or of the privileges of its members, but such power shall not hereafter be exercised except against persons guilty of one or more of the following offenses.:

" 1. The offense of arresting a member or officer of the house in violation of his privilege from arrest as hereinbefore declared.

" 2. That of disorderly conduct in the immediate view and presence of the house, and directly tending to interrupt its proceedings.

" 3. That of publishing any false and malicious report of the proceedings of the house, or of the conduct of a member in his legislative capacity.

4. " That of refusing to attend or be examined as a witness, either before the house or by a committee, to take testimony in legislative proceedings.

" 5. That of giving or offering a bribe to a member, or of attempting by menace or any other corrupt means or device, directly or indirectly, to control or influence a member in giving his vote, or to prevent him from giving the same."

The five enumerated offenses are the only ones which either house is authorized to punish as contempts, and they take the place of the numerous offenses and acts which were treated by parliament as contempts, and in place of the varied and severe punishments inflicted by parliament for such contempts, the statute above cited provides (§ 14) that " in all cases in which either house shall punish any of its members or officers, or any other person, by imprisonment, such imprisonment shall not extend beyond the same session of the legislature."

It is claimed on the part of the relator that the provisions of the Revised Statutes relative to contumacious witnesses, were superseded and abrogated by the Penal Code, which took effect December 1, 1882. The argument presented is, that by section 69 of the Penal Code, it is declared that " a person who, being present before either house of the legislature, or any committee thereof authorized to summon witnesses, willfully refuses to be sworn or affirmed, or to answer any material and proper question, or to produce upon reasonable notice any material and proper books, papers or documents in his posses-

sion or under his control, is guilty of a misdemeanor." Section 719 provides that " an offense specified in this Code committed after the beginning of the day when this Code takes effect, must be punished according to the provisions of this Code, and not otherwise," and section 726 enacts that " all acts and parts of acts which are inconsistent with the provisions of this act are repealed, so far as they impose any punishment for crime except .as herein provided." It is urged that the refusal of a witness to answer before a legislative committee, being by the Code made a crime punishable by the courts as a misdemeanor, the provisions of the Revised Statutes making such refusal punishable as a contempt are abrogated, and the two statutes cannot .co-exist, for two reasons : First, because no person can be punished twice for the same offense ; and secondly, because by the .express provisions of section 719, an offense for which the Code prescribes a punishment cannot be punished in any other manner. Throwing out of view the provisions of 2 R. S. 278, and .of the Penal Code, §§ 680, 681, which permit the punishment .of criminal contempt both by indictment and proceedings for contempt, as applicable only to contempt of courts, and not to .contempt of the legislature, the first of these reasons is .answered by section 677 of the Penal Code, which provides that " an act or omission which is made criminal and punishable in .different ways, by different provisions of law, may be punished under any one of those provisions, but not under more than .one ; and a conviction or acquittal under one, bars a prosecution for the same act or omission under any other provision." The answer to the second reason assigned, is to be found in section 724 of the Penal Code, which was not referred to on the argument, and which declares that " this Code does not affect any power conferred by law upon any court-martial or other military authority or officer, to impose or inflict punishment upon offenders, nor any power conferred by law *upon any public body*, tribunal or officers, to impose or inflict punishment for a contempt, nor any provisions of the laws relating to apprentices," etc., etc. .

It seems to us that it was the intent of this section to retain in full force the provisions of the Revised Statutes conferring authority upon the two houses of the legislature to impose

punishment for the specified contempts, and that we cannot avoid meeting the question of the constitutionality of those provisions.

At the time of their enactment, as appears by the note of the revisers, it was assumed that although the State constitution of 1821 was silent upon the subject of the privileges of the legislature or either house, yet that it was not intended to deprive the two houses of the power, which the revisers characterized as indispensable, of punishing contempts, which it had then been determined by the Supreme Court of the United States in the case of Anderson *v.* Dunn, 6 *Wheat.* 204, was possessed by the house of congress by necessary implication, the constitution of the United States being equally silent upon the subject, and it was deemed proper to provide a legislative definition of those privileges of the houses and their members, the breach of which should be regarded as a contempt. With this view the new provisions were framed. See note to title 2, chapter 7, part 1, R. S.

The case of Anderson *v.* Dunn, *supra*, was an action for assault and false imprisonment against the sergeant-at-arms of the house of representatives. The defendant pleaded in justification, a resolution of the house which recited that the plaintiff had been guilty of a breach of the privileges of the house and of a high contempt of the dignity and authority of the same, and that under a warrant issued by the speaker, by authority of the house, the plaintiff had been brought to its bar and heard in his defense and adjudged to be guilty and ordered to be imprisoned. The plea was held good on demurrer, though neither the nature of the contempt nor the evidence of it appeared. A general power to punish for contempt was held to be vested in the house as necessarily incident to the exercise of its functions, and its adjudication was held sufficient to establish the fact of the contempt.

In the later case of Kilbourn *v.* Thompson, 103 *U. S.* 168, which was a similar action, the plaintiff had, on proceedings similar to those taken in the present case, been convicted of a contempt and sentenced by the house of representatives to imprisonment. It appeared on the face of the proceedings that the contempt consisted of his refusal to answer a question

propounded by a committee of the house appointed by a resolution which was set forth. This resolution directed the committee to investigate certain bus:ness transactions in which the United States government was interested simply as a creditor of one of the parties, and the Supreme Court held that the preamble and resolution under which the committee was appointed, showed upon their face that the investigation ordered did not have for its object any legislative action or the impeachment of any officer of the government, but the collection of a debt owing to the government, a power which congress could not exercise, but which was vested only in courts of justice; that in ordering such an investigation the house of representatives exceeded the limits of its powers, and consequently the committee had no authority to require the plaintiff to testify before it. On this sole ground the decision of the court was placed, but in arriving at this conclusion several important points, which have a bearing upon the question now before us, were discussed in the highly instructive opinion of MILLER, J.

The case of Anderson *v.* Dunn, in so far as it held the resolution of the house finding the plaintiff guilty, conclusive, was distinctly overruled.

The decision necessarily involved the point stated in other parts of the opinion, that a legislative body is not to be assimilated to a court of general jurisdiction; that congress has no general power of adjudicating upon contempts. The reasoning and authorities upon which this decision is based convince us that it is incontestable. Stockdale *v.* Hansard, 9 *Ad. & El.* 1; Keilley *v.* Carson, 4 *Moore P. C.* 63; Opinion of COLERIDGE, J., Burnham *v.* Morrissey, 14 *Gray,* 226. The case of Anderson *v.* Dunn was also distinguishable in Kilbourn *v.* Thompson, on the ground that as the plea in the first-mentioned case did not disclose the ground on which the plaintiff had been held guilty of contempt, it was no precedent for a case where the plea established, by its recital of the facts, that the house had exceeded its authority. It was also held, following a course of reasoning which need not be repeated here, that the right of the house of representatives to punish a citizen for a contempt of its authority, derived no support from the precedents and practice of the two houses of the English parliament, nor from

the adjudged cases in which the English courts have upheld those practices. That the powers of congress were derived solely from the Federal constitution, and that such as were not conferred by that instrument, either expressly or by fair implication, were reserved to the States respectively or to the people, and that while the house had power to punish contempts by fine and imprisonment in certain cases, it had no general jurisdiction on the subject, but was confined to those cases where the power was expressly conferred by the constitution, or was necessary to enable the house to exercise its lawful functions. Express power is given by the constitution to each house to punish its members for disorderly behavior, and to compel the attendance of absent members, under such penalties as the house may prescribe, and the opinion concedes that among the incidental and implied powers of congress may be that of compelling the attendance of witnesses and punishing contumacious witnesses in the same manner as could be done by a court of justice, in dealing with cases which congress is empowered to decide—such as the election and qualification of its members, the trial of a contested election, and proceedings in the house to impeach officers of the government. Whether their power over recusant witnesses extends beyond those cases, the court, in reviewing the case of Anderson *v.* Dunn, expressly declines to decide, but the court does emphatically declare that whether the power of punishment in either house by fine or imprisonment goes beyond the specified cases or not, no person can be punished for contumacy as a witness before either house, unless his testimony is required in a matter into which the house has jurisdiction to inquire, and that neither of those bodies possesses the general power of making inquiry into the private affairs of the citizen. To the like effect is the opinion of the supreme court of Massachusetts. in the case of Burnham *v.* Morrissey, 14 *Gray*, 226. " The house of representatives has the power under the constitution to imprison for contempt, but the power is limited to cases expressly provided for by the constitution, or to cases where the power is necessarily implied from those constitutional functions and duties to the proper performance of which it is essential."

It must be borne in mind that the case cited, did not arise

under any act of congress authorizing either house to punish contumacious witnesses, for there is no act. The question was, whether a general power to punish contempts was inherent in congress as necessary to the exercise of its functions, independent of any statute. That such a power could be exercised to compel the attendance of witnesses in certain cases was conceded. Whether it existed in cases of investigations properly instituted for the purposes of legislation was left an open question. So far as the statutes of the United States were concerned, a different course of proceedings was prescribed. The act of January 24, 1857—chap. 19—provided that any person summoned as a witness before either house or a committee thereof, and refusing to appear or to answer any question pertinent to the matter in consideration, should, in addition to the pains and penalties then existing, be liable to indictment and punishment as for a misdemeanor, and it was made the duty of the president of the senate to certify the facts to the district attorney for the District of Columbia, who was required to lay the matter before the grand jury. This act was incorporated with modifications in the Revised Statutes of the United States, §§ 102, 104. The other pains and penalties alluded to, must have had reference to the supposed power to punish for contempt. But if, as contended, no such power can be exercised by congress under the limited authority delegated to it by the constitution, the power could not be created and conferred by any statute.

The case now before us is entirely different. It arises under a statute enacted by the legislature of the State of New York. The inquiry is not whether the power to enact such a law is to be found in the State constitution, but whether such legislation is prohibited or restrained by that instrument, or by the constitution of the United States. Except as thus limited, the State legislature possessed the whole legislative power of the State. Bank of Chenango v. Brown, 26 N. Y. 469; People ex rel. Williams v. Dayton, 55 Id. 380.

The only express provision of the constitution which is claimed to be violated, is that which declares that no person shall be deprived of life, liberty or property without due process of law. If the statute in question was within the power

of the legislature to enact, the proceedings against the relator were due process of law. He was imprisoned by virtue of a pre-existing law, informed of the charge made against him, and was heard in person and by counsel in his defense. The proceedings need not be according to the course of the common law (Happy *v.* Mosher, 48 *N. Y.* 313; People *ex rel.* Witherbee *v.* Supervisors, 70 *Id.* 228), and we necessarily come back to the question whether the legislature had the power to enact the law.

But the main ground upon which the statute is assailed is that it confers upon each of the two houses a power which is in its nature judicial, to hear, adjudge and condemn; that no such power can be conferred by the statute upon the legislature itself or either branch thereof; that the constitution gives the senate and assembly only legislative power, and that judicial power is vested in the courts named in the constitution, and in such inferior courts as may be created, and that the grant of judicial power to the courts is an implied prohibition of its assumption by the legislature, except as authorized by the constitution.

The constitution of the United States declares, in terms, that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the congress may from time to time order and establish. Although no similar declaration is contained in the constitution of this State, still it is a recognized principle that in the division of power among the great departments, the judicial power has been committed to the judiciary, as the executive power has been committed to the executive department and the legislative to the legislature, and that body has no power to assume the functions of the judiciary to determine controversies among citizens, or even to expound its own laws so as to control the decisions of the courts in respect to past transactions. People *v.* Supervisors, 6 *N. Y.* 432. To declare what the law shall be is a legislative power; to declare what it is, or has been, is judicial. THOMPSON, J., in Dash *v.* Van Kleeck, 7 *Johns.* 498. But, notwithstanding this general division of powers, certain powers in their nature judicial are, by the express terms of the constitution, vested in the legislature. The power of impeachment is vested in the assembly. Each house is made the judge of the qualifications and election

of its own members.    The power of removal of certain judicial officers is given by the constitution to the senate and assembly and may involve inquiries judicial in their nature, and by statute, certain other officers may be removed by the senate on the recommendation of the governor.    1 *Rev. Stat.* 123, § 41. I think it would be going too far to say that every statute is necessarily void which involves action on the part of either honse partaking in any degree of a judicial character, if not expressly authorized by the constitution.    Where the statute relates to the proceedings of the legislative body itself, and is necessary or appropriate to enable it to perform its constitutional functions, I cannot regard it as such an invasion of the province of the judiciary as should bring it within any implied prohibition of the State constitution.    That instrument contains no express provision declaring any of the privileges of the members of either house, except that for any speech or debate in either house the members shall not be questioned in any other place.    Even the privilege of exemption from arrest during the session is not declared.    No power to keep order, or to punish members or others for disorderly conduct, or to expel a member, is contained in the State constitution, as it is in the constitution of the United States.    All these matters are, in this State, left under the regulations of the statutes, and there is not even express power to enact such statutes.    1 *Rev. Stat.* ch. 7, tit. 2.    The necessity of the powers mentioned is apparent and is conceded in all the authorities.    See *Cooley Const. Lim.* 133.    Yet it is equally apparent that statutes upon the subject must authorize some action partaking of a judicial character.    If that feature is a fatal objection, it annuls all the statutory provisions in which it appears.

The power of obtaining information for the purpose of framing laws to meet supposed or apprehended evils, is one which has, from time immemorial, been deemed necessary, and has been exercised by legislative bodies.    In this State it does not rest upon precedent merely, but is expressly conferred by statute (1 *Rev. Stat.* 158, §§ 1, 2) which provides that every chairman of a committee either of the senate or assembly, or of any joint committee, is authorized to administer oaths to witnesses, and when the committee is, by the terms of the resolu-

tion appointing it, authorized to send for persons and papers, the chairman has power, under the direction of the committee to issue compulsory process for the attendance of any witness within the State whom the committee may wish to examine, and to issue commission for the examination of witnesses out of the State. To subject a witness to punishment as for contempt, the testimony sought must, as has already been shown, relate to a legislative proceeding. 1 *Rev. Stat.* 154, § 13, subd. 4.

It is difficult to conceive any constitutional objection which can be raised to the provision authorizing legislative committees to take testimony and to summon witnesses. In many cases it may be indispensable to intelligent and effectual legislation to ascertain the facts which are claimed to give rise to the necessity for such legislation, and the remedy required, and irrespective of the question whether in the absence of a statute to that effect either house would have the power to imprison a recusant witness, I cannot yield to the claims that a statute authorizing it to enforce its process in that manner is in excess of the legislative power. To await the slow process of indictment and prosecution for a misdemeanor might prove ineffectual, and necessary legislation might be obstructed and perhaps defeated, if the legislative body had no other and more summary means of enforcing its right to obtain the required information. That the power may be abused is no ground for denying its existence. It is a limited power, and should be kept within its proper bounds; and when these are exceeded, a jurisdictional question is presented, which is cognizable in the courts. My conclusion is that subdivision 4 of section 13, 1 Rev. Stat., is constitutional and valid. These views are supported by the decision of this court in Wilckins *v.* Willett, 1 *Keyes*, 521–525, where it was held that the house of representatives of the United States had the power to compel the attendance of witnesses.

In that case this court said, per JOHNSON, J.: "That the power exists, admits of no doubt whatever. It is a necessary incident of the sovereign power of making laws, and its exercise is often indispensable to the great end of enlightened, judicious and wholesome legislation. The power is rather judicial in its nature, but in a legislative body exists as an auxiliary to the legislative power only." And further, at page 526: The power to

punish for disobedience and contempt in refusing to attend is a necessary incident to the power to require and compel attendance.    S. C., 4 *Abb. Ct. App. Dec.* 596 ; 10 *Abb. Pr.* 164 ; 12 *Id.* 319.    It was in deference to this decision, and to the case of People *v.* Learned, 5 *Hun*, 626, that WESTBROOK, J., sitting in the Oyer and Terminer, dismissed the writ of *habeas corpus* in this case, at the same time delivering a learned and able opinion in support of the opposite view, which has been of much service to the court in examining the case.    The learned judge treats the case of Wilckins *v.* Willett, as based upon the reasoning in Anderson *v.* Dunn, and the latter case as overruled in Kilbourn *v.* Thompson ; but a careful examination shows that the case of Anderson *v.* Dunn was overruled in Kilbourne *v.* Thompson, only in so far as it recognized a general power in the house to punish for contempts, and the conclusiveness of its judgment ; while in regard to the proposition that the power exists for the purpose of compelling the attendance of witnesses as auxiliary to the legislative power, the opinion in Kilbourne *v.* Thompson, 189, said in terms that that proposition was one which the court did not propose to decide in the case then before it, as it was able to decide it without passing upon the existence or non-existence of such a power in aid of the legislative function.    Throughout this Union, the practice of legislative bodies, and in this State, the statutes existing at the time the present constitution was adopted, and whose validity has never before been questioned by our courts, afford strong arguments in favor of the recognition of the right of either house to compel the attendance of witnesses for legislative purposes, as one which had been generally conceded to be an appropriate adjunct to the power of legislation, and one which, to say the least, the State legislature has constitutional authority to regulate and enforce by statute.

Two other points are presented on this appeal.    One is that the investigation on which the relator was sought to be examined was one which the house was not authorized to institute, and that the case, therefore, falls within the decision in Kilbourn *v.* Thompson, and the other, that the questions which the relator refused to answer were not pertinent or proper. This second point we do not deem it necessary to discuss,

because the contempt charged, consisted not merely of the relator refusing to answer those questions, but of his refusing to be further examined, or to remain in attendance upon the committee, though informed that his examination was not concluded, and warned not to leave, and that if he left he did so at his peril.    Assuming that the statute—subdivision 4 of section 13—is valid, and that the investigation was a legislative proceeding which the house had authority to institute, we think that by refusing to be further examined, and withdrawing from the presence of the committee without its consent, he brought himself within the terms of subdivision 4, defining as an offense, " refusing to attend or be examined as a witness, either before the house or a committee to take testimony in legislative proceedings."    His refusal to be further examined, or to remain in attendance, was placed upon the ground that the committee refused to recognize his right to be attended by counsel and act under his advice in answering questions ; but we are of opinion that he had no constitutional or legal right to the aid of counsel on such examination.    The constitutional provision on the subject is, that, " in any trial in any court whatever, the party accused shall be allowed to appear and defend in person and with counsel, as in civil actions."    *Const.* art. 1, § 6.    This provision has been very liberally construed and held to apply to trials before any authority having jurisdiction to try, and in People *ex rel.* Nichols *v.* Mayor, 79 *N. Y.* 582, this court held that a police commissioner appearing before the mayor of the city of New York to show cause why he should not be removed for cause, pursuant to the statute, was entitled to defend by counsel.    But here, the relator was not on trial, nor was he a party, but he was a mere witness called upon to testify in relation to charges against another person, and there was no trial pending against any one.    As well might a witness examined before a grand jury, conducting the investigation of a charge against another person, with a view to his indictment, claim the right to be attended by counsel.    We do not think that a mere witness has this right.

We are finally brought to the consideration of the important and more doubtful question, whether the investigation which the committee was conducting was a legislative proceed-

ing which the house was authorized to institute. This is a jurisdictional question, for the statute applies only to such proceedings, and if the house had any authority, independently of the statute, that must depend upon the question whether the testimony was sought for the purpose of aiding it in the performance of any of its constitutional functions. An investigation instituted for the mere sake of investigation, or for political purposes, not connected with intended legislation, or with any of the other matters upon which the house could act, but merely intended to subject a party or body investigated, to public animadversion, or to vindicate him or it, from unjust aspersions, where the legislature had no power to put him or it on trial for the supposed offenses, and no legislation was contemplated, but the proceeding must necessarily end with the investigation, would not, in our judgment, be a legislative proceeding or give to either house jurisdiction to compel the attendance of witnesses or punish them for refusing to attend. Where public institutions under the control of the State are ordered to be investigated, it is generally with the view of some legislative action respecting them, and the same may be said in respect to public officers. In Kilbourn v. Thompson, the court said, p. 193 : " If any purpose had been avowed to impeach the secretary, the whole aspect of the case would have been changed ;" but the court held that the recitals in the resolution repelled any such idea, and (pp. 194, 195) that no hint of any intention of final action by congress on the subject appeared in the resolution, and that on the argument no suggestion had been made of what the house of representatives or congress could have done in the way of remedying the alleged wrong, and they held that that was simply a fruitless investigation into the personal affairs of individuals which could result in no valid legislation on the subject to which the inquiry referred, and therefore that the house had no authority in the matter.

In the present case, the language of the resolution was as follows :

" Whereas, Grave charges of fraud and irregularity have been made from time to time by the public press, and recently by the Union League Club of the city of New York, against

Hubert O. Thompson, commissioner of public works of the city of New York; and

" *Whereas*, These charges have in the opinion of many persons never been satisfactorily explained or fairly refuted; and

" *Whereas*, It is vital importance to all the tax-payers of the State that the heads of all public departments should be beyond reproach; therefore, be it

" *Resolved*, That the standing committee on the affairs of cities of the senate be and it hereby is directed and empowered to investigate the department of public works in the city of New York, power to send for persons and papers, and said committee is hereby authorized to employ a stenographer and such counsel and accountant as it may deem necessary for the thorough discharge of the duties hereby imposed. Such committee to report the result of such investigation and its recommendations concerning the same to the senate on or before the fifteenth day of April next."

If the resolution had shown upon its face that the only purpose of the investigation was to satisfy the tax-payers of the State as to the truth of the charges, or to relieve the department from reproach, and no further action was contemplated or could be had in the matter by the legislature, the case would fall within the decision in Kilburn *v.* Thompson. But such was not the case. The department of public works was created and its duties prescribed by a statute of the State, and if the system was so defective as to admit of frauds or irregularities which could be guarded against by further statutory regulations, it was in the power of the legislature to enact them. That some action of this nature was in contemplation is indicated by the provision in the resolution requiring the committee to report the result of its investigation, and its recommendations concerning the same. The legislature had no power to remove the commissioner or any officer of the department, and the only action the committee could recommend would be appropriate legislation to prevent a recurrence of the frauds or irregularities if they were found to exist, and to be of such a nature that they could be prevented or rendered more difficult by legislation. We are bound to presume that the action of the leg-

islative body was with a legitimate object, if it is capable of being so construed, and we have no right to assume that the contrary was intended. The same principle which renders it the duty of the court to hold legislative action illegal, when it unduly encroaches upon the province of the judiciary, forbids interference by the latter with the action of legislative bodies or the exercise of their discretion in matters within the range of their constitutional powers.

I have reached the conclusion, on the whole case, that the order of the General Term should be reversed and that of the Court of Oyer and Terminer affirmed, except in so far as it remands the relator to the custody of the sheriff, the term of his imprisonment having ended with the session of . the legislature.

All concur.