## EX PARTE PARKER.

WITNESS—CONTEMPT—LEGISLATURE—EVIDENCE.—A committee appointed under concurrent resaolution of the' Legislature and authorized by it and by subsequent act to investigate the affairs of the State Dispensary, to send for persons and papers and to require answer to any question the committee deems relevant to such investigation, has power to commit a witness for contempt for refusal to answer whether a party who had had dealings with the State Dispensary had said to him in fact or in effect that he had given rebates or graft or money in some improper way, or had improperly influenced the Board of Directors in the purchase of liquors. Such evidence is not hearsay as to the dealer with the Dispensary and cannot be withheld because it would violate the implied confidence of a private conversation.

Application for writ of *habeas corpus* by Lewis W. Parker in original jurisdiction of this Court.

*Mr. H. J. Haynesworth,* for petitioner. *Messrs. Frasier* and *Gaston,* for committee.

June 30, 1906. The opinion of the Court was delivered by

MR. JUSTICE WOODS. A committee appointed by the General Assembly to investigate the Dispensary asked Lewis W. Parker, a witness testifying before it, a question which he refused to answer, whereupon the committee held him to be in contempt, and ordered its marshal to hold him in custody until he would answer. The witness Parker then sought by *habeas corpus* proceedings to be released by this Court from the custody of the marshal of the committee. Upon the hearing of the return an order was made adjudging the confinement of the petitioner to be lawful and remanding him to the custody of the marshal. We propose now to give the reasons for the Court's conclusion that the committee did not transcend its powers in ordering the arrest.

It is necessary to understand first the object for which the committee was appointed and the extent of the authority

conferred upon it. The Senate and House of Representatives on January 31st, 1905, passed a concurrent resolution providing for the appointment of three Senators and four members of the House "to investigate the affairs of the State Dispensary." The second section of the resolution is important and is, therefore, set out in full: "That said committee be, and is hereby, empowered to send for papers and persons, to swear witnesses, to require the attendance of any parties whose presence shall be deemed necessary, to appoint an expert accountant and stenographer, and to investigate all transactions concerning said Dispensary and its management, and to take testimony either within or without the State, and shall have access at all times during their service to all the books and vouchers and other papers of said institution, especially in investigating the following facts:

"(a) Whether or not it is a fact that houses represented by agents who are near relatives of the members of the Board of Directors, receive large orders at each purchase.

"(b) Is it a fact that members of the Board of Directors are, or have been, agents for certain wholesale houses from which large purchases are made?

"(c) Is it a fact that parties to whom large orders are given are not wholesale dealers but brokers, and that the orders are filled by third persons, thus making the State pay the commissions of the middleman?

"(d) Was it necessary to purchase the large quantity of liquors ordered in December, 1904, to fill demands, and especially the new and fancy goods purchased which is unknown to the trade?

"(e) Are the extraordinary heavy purchases made necessary to the best interest of the Dispensary system?

"(f) What is the financial standing of the business, and is it run on the best principles for the interest of the law as originally passed and amended?

"(g) Is it a fact that the State, through the Dispensaries, is violating the Constitution of 1895, in that it is selling whiskey in less quantities than one-half of one pint?

"(h) Is it a fact that the State is selling 5's in case goods to its customers and charging them for one quart?

"(i) Is it a fact that certain agents are traveling over the State and offering special inducements to County Dispensers to 'push' certain brands of liquors, and if so, is it a fact known to the members of the State Board of Directors?

"(j) Is it a fact that certain requirements of the law are dispensed with by the County Dispensers by order of, or by the consent of, the members of the State Board of Directors?

"(k) Has the whiskey which has been recently purchased been ordered out from the dealer, or is it held in reserve for future delivery?

"(l) What is the indebtedness of the Dispensary for liquors which have been bought but not delivered?

"(m) And any and all other matters relating to the management of the State Dispensary, and of any official or person in relation thereto.

"(n) Is it, or not, a fact that excessive freights have been paid to railroads for transporting liquors into the State, when said liquors could have been shipped into the State by water at less cost to the State?

"(nn) Whether there is any warrant of law or authority for the establishment and conduct of what is commonly known as 'Beer Dispensaries,' as they are now and have been conducted?"

After the committee had been appointed and entered upon the investigation, the General Assembly, on January 26, 1906, enacted a statute intended to enlarge its powers, and to remove any doubt as to its right to exercise the powers which the concurrent resolution had purported to confer. Only the preamble and the first and second sections of the statute are relevant to this inquiry: "Whereas, a Committee has been appointed to investigate the State Dispensary under the Concurrent Resolution of the General Assembly, dated the 31st day of January, 1905; and whereas, in the progress of the work of the said Committee, some doubt has arisen as to the power of the said Committee in the discharge of their

duties; and it being provided in section 5 of said Concurrent Resolution that the said Committee should apply to the General Assembly for such other power and authority as the circumstances arising during this investigation may seem to require; therefore,

"Section 1. *Be it enacted* by the General Assembly of the State of South Carolina, That the Committee heretofore appointed under the terms of the Concurrent Resolution, dated the 31st day of January, 1905, or any other Committee or Committees that may be appointed, are hereby authorized and empowered to elect a marshal, who, upon being sworn, shall be and become a peace officer of the State and invested with all the power of sheriffs and constables in the service of any and all process issued by the Committtee aforesaid, and with the power to arrest and imprison upon the order of the said Committee any and all persons who shall fail and refuse to obey any legal order of the said Committee, or who shall be guilty of any disorderly conduct in the presence of said Committee during any session thereof, or who shall be guilty of any contempt of said Committee.

"Sec. 2. The said Committee be, and are hereby, authorized and empowered to call before them by summons or notice, in such form as the Committee may adopt. and to be served by the Marshal of said Committee, or such other officer of the State as may be by the Committttee required. such person or persons as the Committee deem proper, and to require such person or persons to answer, upon oath, any and all questions that the Committee may deem relevant and may propound to him or them; and upon the failure or refusal of such person or persons to obey such summons or notice, or to answer such questions or questions, such person or persons shall be deemed to be in contempt of the authority of said Committee, and may be imprisoned upon the order of the said Committee in the common jail, to be there held until he or they shall comply with the order of the said Committee: *Provided,* That no testimony given by said witnesses shall be used against them in a criminal prosecution."

Under the authority thus conferred, Lewis W. Parker was summoned by the committee of investigation and sworn as a witness. After testifying to the fact that he had conversed with a person who told the witness he had dealt with the Dispensary, the witness refused to answer this question: "Mr. Parker, wasn't this statement that this party made to you to the effect or of the nature that he had given rebates or graft or money in some improper way or had improperly influenced this Board of Directors to give him business?" The witness earnestly contended before the committee, and in this Court in the *habeas corpus* proceedings, that he should be excused from answering, (1) because he could not be required to violate the implied confidence of a private conversation, and (2) because the evidence sought to be adduced was hearsay and, therefore, not admissible. Clearly neither of these reasons is sufficient.

The power of the General Assembly to obtain information on any subject upon which it has power to legislate, with a view to its enlightenment and guidance, is so obviously essential to the performance of legislative functions that it has always been exercised without question. After the decision of the Supreme Court of the United States in the case of *Kilbourn* v. *Thompson,* 103 U. S., 188, some doubt seems to have arisen as to the right of the Congress or even of a State Legislature in seeking such information to imprison contumacious witnesses. In that case, it is true, the right of a committee of the House of Representatives to imprison a witness for refusing to answer was denied, but the case presented peculiar features. The committee was not appointed and was not conducting its investigation under a statute or resolution of the Congress but of only one branch of the legislative department, which undertook to confer upon it the power to send for persons and papers. The investigation related to a particular claim of the Federal Government, the status of which, having been already fixed by a settlement, could not have been altered by legislation. And in the view of the Court the question propounded to the witness involved

merely an inquiry into the private affairs of the citizen in a matter outside of the domain of the legislative department and within the jurisdiction of the judicial department; the Court holding in this connection that the judicial power residing in the British House of Commons was not conferred on the Congress by the Constitution, and hence precedents from the English Courts sustaining the power of a committee of the House of Commons to punish for contempt were not applicable.

Distinguishing the case of Kilbourn *v.* Thompson, in some of the features above mentioned, the Supreme Court of the United States subsequently held that a committee of the Senate had the right under a resolution of that body to require a broker to answer whether any Senator had employed the firm of which he was a member to buy or sell shares of stock the price of which might be affected by the Senate's action. The investigation having been instituted to inquire into charges made in newspapers of bribery of Senators, the Court held the subject matter of the inquiry was within the range of the constitutional powers of the Senate. *Re Chapman,* 166 U. S., 661.

The case now under consideration is much stronger than the Chapman case. In the first place, it is to be observed the Congress possesses no powers of legislation except those conferred by the Constitution of the United States, while the General Assembly is invested with all the legislative power of the State except that denied by the Constitution. The Dispensary is a public institution, created by the Genearl Assembly, through which it undertakes to control and conduct the sale of liquor in the entire State. The principal officers of the Dispensary are elected by the General Assembly and directions for its management are laid down with particularity in the statutes. The business is so enormous and the problems it presents are so novel and difficult and vital to the public welfare that not only the fullest and widest information as to the practical operations of statutes enacted for its control, and as to the competency and honesty

of its officers, is essential to wise legislative action, but it is also important that the General Assembly should be advised as to the methods used or attempted by those who deal with the Dispensary by the sale of liquor or otherwise. Offering a bribe to a public officer is a criminal offense under the laws of the State; and it is difficult to see any support for the position that a statement of one engaged in selling or seeking to sell to the Dispensary to the effect that he had given or even offered bribes to its Board of Directors would be beyond the legitimate scope of legislative inquiry. It concerns the General Assembly to know of the dishonest dealings, if they exist, of those who sell to the Dispensary almost as much as to know of such dealings by those who buy for it. In this view the answer to the question here asked could not be objectionable as hearsay, even applying the rules of evidence obtaining in strictly judicial tribunals.

But aside from this, rules of evidence are subject to legislative control unless the changes go to the extent of the practical denial of a constitutional right. Here the statute is very broad. It does not relate to the trial of a cause involving the life, liberty or property of an individual, but provides for legislative investigation of a great public enterprise, and it requires answer to any question the committee deems relevant to such investigation. This discretion of the committee was, of course, subject to the limitation that a witness could not be compelled to answer questions when such compulsion would be in derogation of a constitutional right; and it may be that a reasonable construction of the statute is that the committee's discretion was intended to be subject also to the rules of evidence as to the exclusion of privileged communications, and of evidence as to facts affecting the witness personally, falling under his ordinary privilege, but upon this last point we express no opinion. It is not pretended that the witness was required to disclose a privileged communication, or that any personal privilege or constitutional right of the witness himself was involved in requiring an answer to the question asked. As to the posi-

tion that the witness should not have been required to repeat a private conversation, it is hardly necessary to say that the law cannot take account of purely sentimental considerations as against the public interests or substantial rights. We conclude there is no ground for the interference of the Court in behalf of the witness.

The conclusions reached as to the power of legislative committees are sustained by the following authorities: *Anderson* v. *Dunn*, 6 Wheaton, 204; *Re Chapman*, 166 U. S., 661; *Burnham* v. *Morrissey*, 14 Gray, 226 (74 Am. Dec., 676); *Keeler* v. *McDonald*, 2 N. E., 615 (N. Y.); *People* v. *Sharp*, 1 Am. St. Rep., 851 (N. Y.); *Re Gunn*, 19 L. R. A., 519 (Kansas).

MR. JUSTICE GARY *did not sit in this cause.*