### Ex parte DAUGHERTY.

(District Court, S. D. Ohio, W. D., at Cincinnati. May 31, 1924.)

1. **United States ⬥21—Right of each branch of Congress to punish outsider for contempt stated.**

   Each branch of Congress has power to punish outsider for contempt for refusing to testify or produce documents before it, if outsider owes duty of doing so, or for misbehavior injuriously affecting its ability to function; but there is no duty of obedience to aid in investigation judicial in character, unless judicial power is expressly conferred, though, if investigation concerns contempt, there is power to punish for contempt.

2. **United States ⬥21—Decision by either branch of Congress that witness was guilty of contempt not conclusive on courts.**

   Decision by either branch of Congress that witness has been guilty of contempt in disobeying its command to produce documents and testify is not conclusive on courts.

3. **United States ⬥21—If, on any view, action of Senate, authorizing issuance of warrant to bring before it witness refusing to testify before committee, is valid, it should be upheld.**

   If, on any view of matter, Senate resolution, authorizing issuance of warrant to bring before it for questioning witness one who refused to testify before its investigating committee can be held valid, it should be upheld.

4. **Habeas corpus ⬥29—Person unlawfully attached because of refusal to testify before Senate held entitled to bring habeas corpus.**

   If action of Senate in attaching witness refusing to testify before its investigating committee is void, witness had right to bring habeas corpus for discharge from attachment, and was not required to wait until Senate undertook to punish him for contempt.

5. **Witnesses ⬥1—Can be compelled to testify.**

   Courts can compel witness to testify to matters within his knowledge.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(299 F.)

6. **United States ⬤⟹21—That power has not been used by either branch of Congress not conclusive against its existence.**

   That power of either branch of Congress to compel an outsider to testify or produce documents in aid of legislation has never been exercised by either branch of Congress, or that its existence has been unsuspected, is not conclusive against its existence, though this may have bearing on necessity of its existence.

7. **United States ⬤⟹35—Power to impeach is solely in House of Representatives, with Senate as impartial judge.**

   Power to impeach, under Constitution, is solely in House of Representatives, and Senate sits as impartial judge, and not as prosecutor.

8. **Constitutional law ⬤⟹52—United States ⬤⟹23—Senate resolution, authorizing investigation into conduct of former Attorney General, held void.**

   Senate resolution, authorizing investigation into alleged wrongdoings of former Attorney General, *held* void as attempt to exercise judicial function, which has not been conferred on it expressly or by fair implication, and as encroaching on prerogative of House of Representatives to impeach.

In the matter of the application of Mally S. Daugherty for a writ of habeas corpus. Petitioner discharged.

John P. Phillips, of Chillicothe, Ohio, John Logan and Bush & Clyburn, all of Washington C. H., Ohio, and A. I. Vorys, L. F. Sater, E. L. Pease, and W. I. Vorys, all of Columbus, Ohio, for petitioner.

Benson W. Hough, U. S. Atty., of Columbus, Ohio, and Wm. T. Chantland, Asst. Atty. Gen., for respondent.

ANDREW M. J. COCHRAN, District Judge for the Eastern District of Kentucky, sitting by designation in the Southern District of Ohio, Western Division. By the designation of myself to hear this cause, there has been thrust upon me the inescapable duty of passing upon the validity of certain action of the United States Senate. This cause involves a controversy between two individuals. It has come about by one of them restraining the other of his liberty and the latter applying to this court for discharge therefrom. The legality of the restraint depends upon the validity of such action. On April 28, 1924, Mally S. Daugherty, a citizen of Ohio, residing at Washington Courthouse, in this district, and president of the Midland National Bank, engaged in business at that place, was arrested and taken into custody at the federal building in this city by John J. McGrain. McGrain, in so doing, acted under a warrant of the United States Senate, dated April 26, 1924, directed to the sergeant at arms thereof, commanding him to arrest Daugherty and bring him to its bar in pursuance to a resolution that day agreed to by it, which was set forth in full therein. The warrant bore an indorsement, signed by that official, appointing and employing McGrain to serve it. Thereupon Daugherty applied for and obtained from this court a writ of habeas corpus, directed to McGrain, commanding him to have the petitioner's body before it, with the cause of such imprisonment and detention, which has been done. The cause assigned therefor is such warrant. It is the action of the Senate in causing this warrant to be issued whose validity is involved here. Its validity depends upon the question as to whether,

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in taking such action, that body exceeded its powers. In disposing of this question I will first set forth the proceedings which led up to the issuance of the warrant, then interpret and appraise the decisions of the Supreme Court which are thought to be pertinent thereto, and, finally, come to close quarters with and determine it.

1. On March 1, 1924, the United States Senate adopted the following resolution:

"Resolved, that a committee of five Senators, consisting of three members of the majority and two of the minority, be authorized and directed to investigate circumstances and facts, and report the same to the Senate, concerning the alleged failure of Harry M. Daugherty, Attorney General of the United States, to prosecute properly violators of the Sherman Anti-Trust Act and the Clayton Act against monopolies and unlawful restraint of trade; the alleged neglect and failure of the said Harry M. Daugherty, Attorney General of the United States, to arrest and prosecute Albert B. Fall, Harry F. Sinclair, E. L. Doheny, C. R. Forbes, and their conspirators in defrauding the government; as well as the alleged neglect and failure of the said Attorney General to arrest and prosecute many others for violations of federal statutes, and his alleged failure to prosecute properly, efficiently, and promptly, and defend all manner of civil and criminal actions wherein the government of the United States is interested as a party plaintiff or defendant. And said committee is further directed to inquire into, investigate, and report to the Senate the activities of the said Harry M. Daugherty, Attorney General, and any of his assistants in the Department of Justice, which would in any manner tend to impair their efficiency or influence as representatives of the government of the United States. That said committee above referred to and the chairman thereof shall be elected by the Senate of the United States.

"Resolved, further, that in pursuance of the purposes of this resolution said committee or any member thereof be and hereby is authorized, during the Sixty-Eighth Congress to send for persons, books and papers, to administer oaths, and to employ stenographic assistance at a cost not to exceed 25 cents per hundred words, to report such hearings, as may be had in connection herewith, the expenses thereof to be paid out of the contingent fund of the Senate, and that the committee, or any subcommittee thereof, may sit during the sessions or recesses of the Senate."

The committee called for thereby was elected. On March 24, 1924, the petitioner was summoned by subpœna to appear before such committee at its room, 105 Senate Office Building, Washington, D. C., to testify as to what he might know relative to the subject-matter under consideration by it, and to bring with him deposit ledger of the Midland National Bank since November 1, 1920; also note files and transcript of owners of every safety vault; also records of income drafts; also records of any individual account or accounts showing withdrawals of $25,000 or over during that period. Daugherty refused to comply with this summons. On April 11, 1924, two of the members of the committee, Smith W. Brookhart and Burton K. Wheeler, visited Washington Courthouse and there issued and caused to be served on Daugherty a subpœna commanding him to appear before the select committee on investigation of Department of Justice of the United States at their committee room, 12 Cherry Hotel, Washington Courthouse, to testify as to what he might know relative to the subject-matters under consideration by that committee. Daugherty also refused to comply with this summons. The committee reported these refusals of Daugherty to the Senate, and on April 26, 1924, that body adopted the following resolution:

"Whereas, the select committee of the Senate, elected pursuant to Senate Resolution 157, Sixty-Eighth Congress, first session, has submitted a report to the Senate; and

"Whereas, it appears from such report that M. S. Daugherty, as president of the Midland National Bank, Washington Courthouse, Ohio, was on March 22, 1924, duly served with a subpœna to appear forthwith before such committee in Washington, District of Columbia, and then and there to testify relative to subject-matters, and to produce specified files, records, and books, pertinent to the matter under inquiry, and was on April 11, 1924, duly served with a subpœna to appear forthwith before the committee in Washington Courthouse, Ohio, and then and there to testify relative to subject-matters pertinent to the matter under inquiry; and

"Whereas, it appears from such report that the said M. S. Daugherty has, in disobedience of such subpœnas, failed so to appear or answer, or to produce such files, records, and books; and

"Whereas, the appearance and testimony of the said M. S. Daugherty is material and necessary, in order that the committee may properly execute the functions imposed upon it, and obtain information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper: Therefore be it

"Resolved, that the President of the Senate pro tempore issue his warrant, commanding the sergeant at arms or his deputy, to take into custody the body of the said M. S. Daugherty, wherever found, to bring the said M. S. Daugherty before the bar of the Senate, then and there to answer such questions pertinent to the matter under inquiry as the Senate may order the President of the Senate pro tempore to propound, and to keep the said M. S. Daugherty in custody to await the further order of the Senate."

This is the resolution, copied in the warrant, under which the petitioner was arrested, and it was thereunder that the warrant was issued. These proceedings constitute the sole basis and justification of the warrant and arrest. By the original resolutions, those of March 1, 1924, the committee to be elected thereunder was authorized and directed to investigate and report the circumstances and facts concerning the alleged neglect and failure of Harry M. Daugherty, then Attorney General of the United States, in performing his duties as such in four particulars, and his activities and those of any of his assistants, which would in any manner tend to impair their efficiency or influence as representatives of the government of the United States. The investigation, thus authorized, concerned the alleged shortcomings of Harry M. Daugherty, as Attorney General, in the particulars named, and such of his activities as impaired his efficiency and influence in that position, which may be characterized as wrongdoings. It concerned nothing else. It was not recited who had alleged that he had been guilty of such shortcomings, nor that it had been alleged by any one that he had been guilty of such wrongdoings. It was assumed that he had, or, at least, that it was possible that he had. The investigation thus authorized was therefore a purely personal one.

The last resolution, that of April 26, 1924, though it set forth petitioner's disobedience of the two summonses of the committee, did not authorize the issuance of a warrant for contempt because of such disobedience, but of one to bring him before the bar of the Senate to answer such questions pertinent to the matter under inquiry as the Senate might order to be propounded to him. It did not call for the production of any documents, as did the first summons of the committee. It was in this resolution, adopted after such disobedience and its report

to the Senate, that for the first time any intimation was given of the purpose of the investigation. It was that the Senate might obtain information "necessary as a basis for such legislative and other action as" it "may deem necessary and proper."

2. The decisions of the Supreme Court of the United States, thought to be pertinent to the determination of the question before me, are the following: Anderson v. Dunn, 6 Wheat. 204, 5 L. Ed. 242; Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; In re Chapman, 166 U. S. 661, 17 Sup. Ct. 677, 41 L. Ed. 1154; Marshall v. Gordon, 243 U. S. 521, 37 Sup. Ct. 448, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371.

(1) Anderson v. Dunn was an action to recover damages for false imprisonment. The defendant was the sergeant at arms of the House of Representatives. The plaintiff had no connection therewith. He was an outsider. As a justification for the false imprisonment complained of, the defendant set up in his plea that he had acted under a warrant of arrest of that body, issued pursuant to a resolution adopted by it, adjudging plaintiff to have been guilty of a contempt, and requiring him to be brought before its bar to answer therefor. On demurrer to this plea it was held to be good, and the declaration dismissed. The Supreme Court affirmed the judgment. This decision, therefore, stands for the position that the House of Representatives has the power to punish an outsider for contempt. It also stands for the position that the Senate has such power. Such being the case, each branch of Congress has, in this particular, judicial power; i. e., power to exercise the judicial function.

As, in disposing of this case, I have to do with the judicial power of the Senate, it is well that I pause here to consider wherein the judicial function consists. A good definition is not at hand. An attempt must be made to frame one. In the case of People v. Keeler, 99 N. Y. 463, 2 N. E. 615, 52 Am. Rep. 49, brought to my attention by counsel, and hereafter again taken note of, in referring to a certain power conferred by the Legislature of New York on each of its two houses, Judge Rapallo said that it was "in its nature judicial, to hear, adjudge, and condemn." The judicial function, according to this, is "to hear, adjudge, and condemn." He quotes from Thompson, J., in Dash v. Van Kleeck, 7 Johns. (N. Y.) 498, 5 Am. Dec. 291, these words:

"To declare what the law shall be is a legislative power; to declare what it is or has been is judicial."

In Grant v. Buckner, 172 U. S. 236, 19 Sup. Ct. 164, 43 L. Ed. 430, Mr. Justice Brewer said:

"As a rule courts do not create, but simply determine, rights."

These expressions suggest that the judicial function has to do with the determination of rights and duties and of guilt or innocence, and with an inquiry into facthood in order to such determination. Contempt is an offense, and in determining whether a person charged therewith is guilty thereof the judicial function is exercised. It must be accepted, therefore, that the Supreme Court, in deciding that each branch of Congress has power to punish for contempt, held that it

has power in this particular to exercise the judicial function. As such power is not expressly conferred by the federal Constitution, the decision was that it is thereby granted by fair implication. The reasoning upon which the conclusion reached was based is embodied in these two extracts from the opinion (6 Wheat. 227):

"That 'the safety of the people is the supreme law' not only comports with, but is indispensable to, the exercise of those powers in their public functionaries without which that safety cannot be guarded. On this principle it is that courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution."

Again (6 Wheat. 228):

"But what is the alternative? The argument obviously leads to the total annihilation of the power of the House of Representatives to guard itself from contempts and leaves it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it. This result is fraught with too much absurdity, not to bring into doubt the soundness of any argument from which it is derived. That a deliberate assembly, clothed with the majesty of the people, and charged with the care of all that is dear to them, composed of the most distinguished citizens, selected and drawn together from every quarter of a great nation, whose deliberations are required, by public opinion, to be conducted under the eye of the public, and whose decisions must be clothed with all that sanctity which unlimited confidence in their wisdom and purity can inspire, that such an assembly should not possess the power to suppress rudeness, or repel insult, is a supposition too wild to be suggested."

In brief, then, the basis of the implication of the existence of such power was the right of self-defense and self-preservation. The offense of contempt has two aspects. It may consist either in misbehavior or disobedience. There is nothing in the opinion indicating that the latter aspect was had in contemplation. But the decision may rightfully be taken as standing for the position that each branch of Congress has power to punish an outsider for contempt which consists in disobedience. This, however, must be qualified by the statement that it has such power only in case there is a duty of obedience on the part of such outsider. The only conceivable particular in which an outsider can owe either branch of Congress the duty of obedience is in the matter of giving testimony or producing documents. This additional position for which this decision may be taken to stand may be more fully put in thus: Each branch of Congress has power to punish an outsider for disobedience in refusing to give testimony or to produce documents, if such outsider owes the duty of so doing in this particular. The way in which it is to be made out that this decision stands for this is this: The right to punish for contempt for misbehavior was rested on the right of self-defense or self-preservation. It may be put on the right to function. Where the duty of giving testimony or producing documents exists, on the part of an outsider, the performance of such duty is essential that the body to whom it is owed may function. Hence in such case, in order that it may function, it has the right to punish for disobedience. The decision, however, sheds no light what-

ever on the question as to the circumstances under which the duty may be owed by an outsider to either branch of Congress to give testimony or to produce documents. Nor does it shed any light on the question as to the kind of misbehavior that may be punished for contempt. It did not appear from the plea in what particular the plaintiff had misbehaved, and hence there was no occasion for the court to pass on the question as to the kind of misbehavior that may be punished for contempt. It would seem that the plaintiff had attempted to bribe a member of the committee on claims of the House. There is no room to doubt that such misbehavior was within the power to punish for contempt.

The decision seems to have been pretty generally taken to stand for another position than those thus far stated. It seems to have been taken to stand for this position in Kilbourn v. Thompson. That position is that the judgment of the House of Representatives that particular misbehavior on the part of an outsider, necessarily involved in condemning and punishing him for contempt, is conclusive, and the validity of its action cannot be inquired into by the courts. I do not so read the decision. The particular in which the plaintiff had misbehaved not appearing from the plea, and the House having the power to punish for misbehavior in some particular, it was to be presumed that it was for misbehavior in such particular that he had been punished for contempt. As the court said (6 Wheat. 229):

"* * * non constat, from the pleadings, but that this warrant issued fo. an offense committed in the immediate presence of the House."

There is nothing in this favoring the position that, if it had appeared from the plea what had been the particular in which the plaintiff had misbehaved, the judgment of the House would have been held to be conclusive, as to its right to punish for such misbehavior, on the courts. If, however, the decision in this case does stand for this position, it is no longer authority therefor, inasmuch as it has to this extent been overruled by the decision in Kilbourn v. Thompson.

(2) I come, now, to that decision. Its value consists in that it deals with the question as to the power of either branch of Congress—it was that of the House which was involved there—to punish an outsider for contempt for refusing to give testimony and to produce documents. This, of course, depended on the duty of obedience on the part of the outsider in these particulars. It was like the case of Anderson v. Dunn, in that it was an action to recover damages for false imprisonment. The defendant was the sergeant at arms of the House, and he justified his action as having been taken by order of that body. The facts which led up to this action were these: The United States was a creditor of Jay Cooke & Co., which had gone into bankruptcy. The bankrupt had an interest in a partnership, termed a real estate pool. The trustee in bankruptcy had settled with the other members of the firm for that interest. The House of Representatives adopted a resolution calling for the appointment of a committee to "inquire into the nature and history of said real estate pool, and the character of said settlement, with the amount of property involved, in which Jay Cooke

& Co. were interested, and the amount paid or to be paid in said settlement, with power to send for persons and papers, and report to this House." The committee was appointed. Kilbourn, likely a member of the partnership, was summoned by the committee by subpœna to testify and to produce certain documents. He refused to comply with the summons. Thereupon proceedings in contempt were instituted against him. It was for defendant's part in those proceedings that the action against him was brought. This case also went off on demurrer to the plea of the defendant, justifying his action under the House. It was held to be good, and the declaration dismissed.

This judgment the Supreme Court reversed, holding that the House had no power to punish the plaintiff for contempt because of his disobedience, and this on the ground that he owed no duty of obedience. The House had no authority to compel him to testify and to produce the documents called for. In appraising this case, and ascertaining just what it stands for, it is important to understand exactly the basis of the holding that the House had no such authority and the plaintiff owed no such duty. It was that, in ordering and conducting such inquiry, the House was exercising a judicial function, and it had no power to exercise that function in such a case. The way in which the Supreme Court made out that the House had no power to exercise this function in such a case was this: Neither branch of Congress has any judicial power, except such as is expressly conferred upon it by the federal Constitution. This follows from the division which that instrument makes of the powers of the United States, and the express provision vesting its judicial power in one Supreme Court and in such inferior courts as Congress may from time to time ordain. In view thereof there is no possible room for saying that either branch of Congress has any judicial power by fair implication. If either has any, it must be expressly granted. Two extracts from the opinion will make this good (103 U. S. 190):

"It is believed to be one of the chief merits of the American system of written constitutional law that all the powers intrusted to government, whether state or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other. To these general propositions there are in the Constitution of the United States some important exceptions."

Again (103 U. S. 192):

"The Constitution declares that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. If what we have said of the division of the powers of the government among the three departments be sound, this is equivalent to a declaration that no judicial power is vested in the Congress or either branch of it, save in the cases specifically enumerated to which we have referred."

Those cases·are thus referred to (103 U. S. 189):

"The Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be imprisonment, and that it may be for refusal to obey some rule on that subject made by the House for the preservation of order. So, also, the penalty which each House is authorized to inflict in order to compel the attendance of absent members may be imprisonment, and this may.be for a violation of some order or standing rule on that subject. Each House is by the Constitution made the judge of the election and qualification of its members. In deciding on these it has an undoubted right to examine witnesses and inspect papers, subject to the usual rights of witnesses in such cases; and it may be that a witness would be subject to like punishment at the hands of the body engaged in trying a contested election, for refusing to testify, that he would if the case were pending before a court of judicature. The House of Representatives has the sole right to impeach officers of the government, and the Senate to try them. Where the question of such impeachment is before either body, acting in its appropriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases."

Of course, if what I have said above as to trying and adjudicating a contempt proceeding against an outsider, either for misbehavior or disobedience, where there is the duty .of obedience, is the exercise of a judicial function, what is here said is subject to the exception that, in such a case, each branch of Congress has the power to exercise such function, though not expressly given, and that on the ground of fair implication.

It remains to be shown that the Supreme Court held that the House, in ordering and conducting the inquiry in question in that case, was exercising a judicial function, and that it was on the basis of this position, in connection with the one just established, that it held that that body had no authority to compel Kilbourn to testify and to produce the documents called for. As to this there can be no possible question. It was said (103 U. S. 192):

"In looking to the preamble and resolution under which the committee acted, before which Kilbourn refused to testify, we are of opinion that the House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial."

Again (103 U. S. 193):

"If the investigation which the committee was directed to make was judicial in its character, and could only be properly and successfully made by a court of justice, and if it related to a matter wherein relief or redress could be had only by a judicial proceeding, we do not, after what has been said, deem it necessary to discuss the proposition that the power attempted to be exercised was one confided by the Constitution to the judicial and not to the legislative department of the government. We think it equally clear that the power asserted is judicial and not legislative."

Again (103 U. S. 194):

"The case being one of a judicial nature, for which the power of the courts usually afford the only remedy, it may well be supposed that those powers were more appropriate and more efficient in aid of such relief than the powers which belong to a body whose function is exclusively legislative. If the settlement to which the preamble refers as the principal reason why

the courts are rendered powerless was obtained by fraud, or was without authority, or for any conceivable reason could be set aside or avoided, it should be done by some appropriate proceeding in the court which had the whole matter before it, and which had all the power in that case proper to be intrusted to any body, and not by Congress, or by any power to be conferred on a committee of one of the two Houses."

It is to be noted that the nature of the inquiry was held to be judicial in character, notwithstanding the resolution contained no hint of any final action that could be taken by the House, or that it intended to take any such action. That the nature of the inquiry was judicial was recognized by Chief Justice Alvey in the case of In re Chapman, yet to be considered, when it was before him in the lower court, his opinion being reported in 5 App. D. C. 122. As to the decision in Kilbourn v. Thompson he there said:

"The subject-matter of the investigation, therefore, was of judicial cognizance, and not legislative, and this was shown on the face of the resolution."

Notwithstanding such is the real basis for the decision in this case, it has frequently been cited in other cases as being based on the ground that the House has no power to investigate the private affairs of individuals. That was a consideration enforcing the conclusion reached, and it was so recognized by the court. It said (103 U. S. 190):

"We are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possess the general power of making inquiry into the private affairs of the citizen."

Again (103 U. S. 195):

"Was it to be simply a fruitless investigation into the personal affairs of individuals? If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country. By 'fruitless' we mean that it could result in no valid legislation on the subject to which the inquiry referred."

And again:

"What authority has the House to enter upon this investigation into the private affairs of individuals who hold no office under the government?"

But this consideration was not controlling. Apart therefrom the House had no power to make the investigation. It had no power, because the investigation was judicial in character, and such judicial power had not been expressly conferred. The ruling would have been the same if the investigation had been into the public affairs of one who held office under the government, if such investigation had been judicial in character, and not such an investigation as power to make which had been expressly conferred. In other words, what counted in the case was not the subject-matter of the investigation, but the nature of the investigation itself. It was judicial in character. Power to make it did not exist, unless it came within one of the instances in which judicial power was expressly conferred. It did not so come. What the decision, therefore, came to then was that the House, in ordering and conducting the investigation involved therein, had usurped judicial

power. This being so, it had no power to compel Kilbourn to testify and to produce the documents called for, or to punish him for disobedience.

The decision in this case also stands for this position: That the decision of either branch of Congress that it has power to compel a witness to testify and to produce documents, or to punish him for contempt in disobeying a command to do so, involved in the exercise of such power, is not conclusive on the courts. It is not to be presumed, when inquired into therein, that such power was rightfully exercised. The courts have the right to their own convictions on the matter. And in so far as the case of Anderson v. Dunn laid down a contrary position it was overruled.

(3) The case of In re Chapman differs from the others, in that it did not involve the validity of the action of either branch of Congress acting separately. What it involved was the constitutionality of sections 102 and 104, U. S. Rev. Stat. (Comp. St. §§ 157, 159), passed by both houses and approved by the President. In view of this it is not possible for it to have any bearing on this case except indirectly. Section 102 is in these words:

"Every person who, having been summoned as a witness by the authority of either house of Congress, to give testimony or to produce papers upon any matter under inquiry before either house, or any committee of either house of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100, and imprisonment in a common jail for not less than one month nor more than twelve months."

Section 104 provided for the certification of the disobedience of a witness under section 102 to the district attorney for the District of Columbia for indictment. Chapman had been summoned before a committee of the Senate to testify in regard to a matter under investigation by it by virtue of a resolution of that body, and refused to testify. He was indicted under this statute and convicted. He thereupon sued out a writ of habeas corpus, on the ground that these two sections were unconstitutional. They were held to be constitutional, and the writ was denied. The matter under investigation by the Senate committee was certain charges made in the newspapers that members of the Senate were yielding to corrupt influences in the consideration of a bill providing for duties on sugar. No question seems to have been made as to the power of the Senate to make the investigation, and compel outsiders to testify before it and its committee; and none could have been made. The matter concerned its members. The federal Constitution expressly confers on each branch of Congress power to punish its members for disorderly behavior and to expel them. In making the investigation there was no usurpation of authority. It being a case of the rightful exercise of judicial authority, there was authority to compel witnesses to testify. The ground upon which it was claimed that the act was unconstitutional was that it was a delegation of the power to punish for contempt, and there was liability of being twice punished therefor, by the Senate and under the statute. Point was made of the

fact that the resolution under which the committee was appointed did not intimate what was to be done as the result of the investigation. Concerning this it was said:

"We cannot assume on this record that the action of the Senate was without a legitimate object, and so encroach upon the province of that body. Indeed, we think it affirmatively appears that the Senate was acting within its right, and it was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded."

Concerning the words "any matter" in the statute it was said:

" * * * And we think that the word 'any,' as used in these sections, refers to matters within the jurisdiction of the two houses of Congress, before them for consideration and proper for their action, to questions pertinent thereto, and to facts or papers bearing thereon."

(4) The case of Marshall v. Gordon involved the power of the House of Representatives to punish an outsider for contempt because of misbehavior. It involved no question of contempt for disobedience. It was held that the House did not have power to punish as contempt the particular misbehavior complained of, and the judgment of the lower court refusing to discharge the plaintiff in error from custody under contempt proceedings on writ of habeas corpus was reversed. The petitioner in the writ was the district attorney for the Southern district of New York. Impeachment proceedings were pending against him in the House. The contempt complained of was writing a letter to a newspaper and also to the House that was defamatory in character. It was held that such a letter was not calculated to injuriously affect the House's ability to function, and hence the writing thereof was not such misbehavior as to constitute a contempt. The decision may be classed with that in Anderson v. Dunn, in that each involved the right of the House to punish an outsider for contempt consisting in misbehavior. They differ in this. Anderson v. Dunn argued for that right. Marshall v. Gordon argued from it. By this I mean it presupposed the existence of such right, and considered whether the particular misbehavior complained of was within the right. In so doing it went beyond the decision in Anderson v. Dunn, because it did not consider what misbehavior came within the right.

[1, 2] These propositions may therefore be gathered from these four decisions: (1) Each branch of Congress has power to punish for contempt. (2) This, as to outsiders, is conferred by fair implication. (3) The contempt may consist of either misbehavior or of disobedience. (4) The misbehavior, to constitute a contempt, must be such as to injuriously affect the ability to function. (5) In order to a contempt for disobedience there must be a duty of obedience; and the only possible duty of obedience is in the matter of giving testimony or production of documents. (6) There is no duty of obedience to do so, in aid of an investigation judicial in character, unless it is an investigation in the execution of judicial power expressly conferred. (7) An exception to this is that, where the investigation concerns contempt, there is power to punish for contempt. (8) The judgment of the Senate or the House that a party charged has been guilty of contempt is not conclusive on the courts. They are entitled to their own convictions on the subject.

I have been impelled to give such a complete presentation of what these four cases stand for because of the stress that has been placed on them in argument. On behalf of the respondent the decisions in Anderson v. Dunn, In re Chapman, and Marshall v. Gordon have been stressed. On behalf of the petitioner that in Kilbourn v. Thompson has been mainly relied on, though some reliance has been placed on Marshall v. Gordon. Counsel for respondent would dismiss the case of Kilbourn v. Thompson from consideration, on the ground that it concerned an investigation of private affairs. This case involves the power of the Senate to punish for contempt, consisting in disobedience, or rather the duty of obedience to testify on the part of an outsider. It has nothing whatever to do with contempt where it consists in misbehavior. As there can be no question as to the power to punish for contempt where it consists in disobedience, if there is a duty of obedience, the cases of Anderson v. Dunn and Marshall v. Gordon have no bearing here, except that Marshall v. Gordon has bearing on the question of the conclusiveness of the judgment of the Senate; and, as in the case of In re Chapman, the investigation was one which the Senate was expressly authorized to make, there is no possibility of its having a bearing here. It follows that, except to the limited extent stated, as to the case of Marshall v. Gordon, none of these four cases has any bearing here, except that of Kilbourn v. Thompson.

[3, 4] 3. I come, now, to deal directly with the question presented by the case before me. The first thing that I would do is to reiterate what I have said, to the effect that the decisions in Kilbourn v. Thompson and Marshall v. Gordon are authorities for the position that the judgment of the Senate in this case that it has power to compel the petitioner to testify, and to punish him if he refuses, involved in its assertion of the former, is not conclusive. It is not conclusive, not merely on the Supreme Court; it is not conclusive on this court. A federal District Judge is the humblest and loneliest member of the federal judiciary. He is at the bottom, and has no one to help him think clear and straight. It is a matter of great delicacy for such an one to have to pass on the validity of the action of such a body as the United States Senate. It is therefore comforting to feel that I have the Supreme Court behind me in such an undertaking. The question arising in this case and its determination being essential to its disposition, I not only have the right to have a conviction in regard thereto, and to express it and to give it effect, but it is my duty so to do. It is a duty which I cannot shirk.

In each of those two cases the judgment of the lower court was reversed because it upheld the action of the House of Representatives. Of course, if upon any view of the matter the action of that body can be held to be valid, it should be upheld. Counsel for respondent are correct in maintaining that it cannot be pronounced invalid unless it is absolutely void. But I cannot agree with them that petitioner's action in attacking the validity of the action of the Senate is premature. They urge that he should have allowed himself to be taken before the Senate under warrant, and only in case it undertook to punish him for contempt, in not answering some question propounded to him, should he

have sought his discharge. But he was not bound to put the matter off until then. If the action of the Senate in attaching him to testify before it was absolutely void, he had the right to seek his discharge from such attachment. Its action in punishing him for contempt could be absolutely void only on the ground that its action in requiring him to testify was void. In Anderson v. Dunn it was said:

"The duress complained of was sustained under a warrant issued to compel the party's appearance, not for the actual infliction of punishment for an offense committed. Yet it cannot be denied that the power to institute a prosecution must be dependent upon the power to punish. If the House of Representatives possessed no authority to punish for contempt, the initiating process issued in the assertion of that authority must have been illegal; there was a want of jurisdiction to justify it."

Here the duress complained of goes a step further back. It was sustained, not under a warrant to answer a contempt charge, but under one to testify. If, however, the Senate possessed no authority to punish for contempt upon disobedience of its command, it has no authority to command or to attach to testify. Its action in so doing was illegal. There was want of jurisdiction; and petitioner is entitled to discharge from such duress.

Inasmuch as the petitioner was never summoned to testify before the Senate itself, only before its committee, question is made by him as to its right to attach him to so testify. But I pass this by and treat the case as if he had been so summonsed, or as if the warrant under which he was arrested was one for contempt in not testifying before the committee in obedience to its summons. The question before me, therefore, is whether the petitioner owed the duty of obedience to this command of the Senate or its committee to testify, and this depends on the question whether the action of the Senate in originating and conducting the investigation of the former Attorney General was absolutely void.

The sole ground upon which it is claimed, in argument, that the Senate had power to take such action, is that it was taken as auxiliary to the exercise of its legislative function. Reference to such as a ground of its action is to be found in the second resolution of the Senate, under which the warrant was issued under which the petitioner was arrested. This raises the interesting question whether either branch of Congress has the power to compel an outsider to testify and to produce documents before it in aid of its exercise of the legislative function, or rather of that part of such function which belongs to it. What one knows and what information is contained in documents owned by him are his own, just as much so as his horse or his home. Such information is his own by virtue of ownership of the documents containing it. What he knows is his own in the very nature of the case. It exists in his own head and nowhere else.

[5] The question is whether either branch of Congress is entitled to such knowledge or information without his consent, in the aid of legislation. It is well settled that, where it is pertinent to the question at issue, the courts are entitled thereto and can force it out of him, with certain well-recognized exceptions. Wigmore on Evidence, §§ 2190 to

2195, gives the history and logical basis of this rule with great fullness. In section 2192 he says:

"For 300 years it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence."

He refers to it as a "sacrifice which is due from every member of the community." It is a sacrifice "of time and labor" and a sacrifice "of privacy." The question here suggested by this position of respondent is whether every member of the community owes this duty of sacrifice to the state when acting either in its legislative or executive capacity, or is it confined to when it is acting in its judicial capacity. Wigmore refers to this question in section 2195 in these words:

"The duty to give testimony is a duty to the state but the function of enforcing the duty resides specifically in the judicial branch of the government. The constitutional question thus arises, on the one hand, whether the power of enforcement can for any purpose be exercised by the legislative branch, in the course of investigations which it may choose to make, either as preliminary to its decision upon legislation, or as ancillary to the enforcement of its own internal order or can for any purpose be exercised by the executive branch."

Other than certain references in the notes to this statement, he does not otherwise deal with the question. That the giving of testimony in aid of legislation can be enforced by the legislative branch has been upheld by two decisions in the state courts. They are those in the cases of People v. Keeler, 99 N. Y. 463, 2 N. E. 615, 52 Am. Rep. 49, and Ex parte Parker, 74 S. C. 466, 55 S. E. 122, 114 Am. St. Rep. 1011, 7 Ann. Cas. 874.

In the New York case the Senate of that state, because of certain charges of fraud and irregularity against the commissioner of public works of the city of New York, directed its committee to investigate the department of public works in the city of New York, with power to send for persons and papers. It was held that an outsider, summoned to testify before the committee on this investigation, was bound to do so, and was subject to punishment for contempt in refusing. In New York, at the time of the authorization of the investigation there involved, there was in existence a statute enacted by the Legislature providing that every chairman of a committee either of the Senate or Assembly or of any joint committee, authorized to send for papers and persons, had power under the directions of the committee to issue compulsory process for the attendance of the witnesses within the state and another statute, so enacted, providing that each house had power to punish as a contempt any person guilty of the offense of refusing to attend or be examined as a witness either before the House or by a committee to take testimony in legislative proceedings. By the Constitution of New York the state Legislature possessed the whole legislative power of the state, except where prohibited or restrained by that instrument or by the Constitution of the United States. Though it was recited in the resolution authorizing the investigation that the occasion of its adoption was charges of fraud and irregularity against the commissioner of public works in the city of New York, and that it was of

vital importance to all the taxpayers of the state that the heads of all public departments should be beyond reproach, what was authorized to be investigated was the department of public works in that city. It was said:

"It is difficult to conceive any constitutional objection which can be raised to the provision authorizing legislative committees to take testimony and to summon witnesses. In many cases it may be indispensable to intelligent and effectual legislation to ascertain the facts which are claimed to give rise to the necessity for such legislation, and the remedy required; and irrespective of the question whether, in the absence of a statute to that effect, either house would have the power to imprison a recusant witness, I cannot yield to the claim that a statute authorizing it to enforce its process in that manner is in excess of the legislative power."

In the South Carolina case the General Assembly of the state—i. e., both houses thereof—appointed a committee to investigate the affairs of the state dispensary, with power to send for persons and papers, and thereafter, pending the investigation, the General Assembly enacted an act conferring upon the committee the power given them by their appointment. It was held that an outsider summoned to testify before the committee on this investigation was bound to do so, and subject to punishment for contempt in refusing. The Constitution of the state of South Carolina is like that of New York, in that it invests the General Assembly with all the legislative power of the state, except that denied thereby. Here, too, the investigation was of the state dispensary, and it was authorized by both branches of the Legislature, first in the appointment of the committee, and then in the enactment of the statute. It was said:

"The power of the General Assembly to obtain information on any subject upon which it has power to legislate, with a view to its enlightenment and guidance, is so obviously essential to the performance of legislative functions that it has always been exercised without question."

Again:

"The dispensary is a public institution, created by the General Assembly, through which it undertakes to control and conduct the sale of liquor in the entire state. The principal officers of the dispensary are elected by the General Assembly, and directions for its management are laid down with particularity in the statutes. The business is so enormous, and the problems it presents are so novel and difficult, and vital to the public welfare, that not only the fullest and widest information as to the practical operations of statutes enacted for its control, and as to the competency and honesty of its officers, is essential to wise legislative action, but it is also important that the General Assembly should be advised as to the methods used or attempted by those who deal with the dispensary by the sale of liquor or otherwise."

What these two cases stand for, then, is that, in a jurisdiction where the Constitution vests the entire legislative power in the Legislature, except as thereby denied, if an investigation of a department of the state is provided for or authorized by both branches thereof, outsiders can be compelled to testify and punished for contempt in not so doing.

But this is not the case here. In the first place, there is a radical difference in the constitutional provision. By the Tenth Amendment to the federal Constitution it is provided:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

And by section 1 of article 1 of the Constitution it is provided:

"All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

The question here is whether, in view of these constitutional provisions, either branch of Congress, acting by itself, can compel an outsider to testify and to produce documents to aid it in performing its part in the enactment of legislation. The Constitution of the state of Ohio is similar in these respects to the federal Constitution. The Supreme Court of Ohio, in the case of State v. Guilbert, 75 Ohio St. 1, 78 N. E. 931, held this:

"The Constitution of this state contains no express grant of power to either branch of the General Assembly to appoint a select investigating committee for general legislative purposes, and such power is not necessarily implied from the express grants to each house."

"The whole legislative power of this state having been conferred by the Constitution upon the General Assembly as a unit, and not upon the Senate or House of Representatives acting separately, a single branch of the General Assembly so acting has no power of independent legislation, except as expressly granted in the Constitution, or as necessarily implied in the express grants."

The Supreme Court of the United States has not only never held that such power exists; it has never said anything favoring its existence. In Kilbourn v. Thompson it said:

"We are of opinion that the right of the House of Representatives to punish the citizen for a contempt of its authority or a breach of its privileges can derive no support from the precedents and practices of the two houses of the English Parliament, nor from the adjudged cases in which the English courts have upheld these practices. Nor, taking what has fallen from the English judges, and especially the later cases, on which we have just commented, is much aid given to the doctrine, that this power exists as one necessary to enable either house of Congress to exercise successfully their function of legislation. This latter proposition is one which we do not propose to decide in the present case, because we are able to decide it without passing upon the existence or nonexistence of such a power in aid of the legislative function."

This language would seem to look with disfavor on the existence of such power. In the case of Henry v. Henkel, 235 U. S. 219, 226, 35 Sup. Ct. 54, 56 (59 L. Ed. 203), which involved the right to have removed to the District of Columbia, under Rev. Stat. U. S. § 1014 (Comp. St. § 1674), a defendant indicted in that District under section 102, Rev. Stat. U. S., the contention between the parties was thus stated:

" * * * Petitioner's counsel, renewing the objections made in the District Court, insist that the resolution did not authorize an inquiry as to the matter about which Henry refused to testify; that the facts charged do not constitute an offense under the statute; or, if so, that the statute is void. On the authority of In re Chapman, 166 U. S. 661, 668, Kilbourn v. Thompson, 103 U. S. 168, and other cases, they insist that in the trial of contested elections, in cases involving the expulsion of members, or other quasi judicial proceedings, the House or Senate may, like any other court, compel material and

noncriminatory disclosures. But they argue that, in view of the provisions of the Fourth Amendment to the Constitution, neither house can compel a citizen to disclose his private affairs as a basis for legislation. ∗ ∗ ∗ The government, on the other hand, insists ∗ ∗ ∗ that Congress may provide for the punishment of witnesses who, in answer to a question propounded by its authority, fail to make noncriminatory disclosures and furnish information deemed necessary as a basis for legislation."

The Supreme Court held that the decision of this contention was with the trial court and did not pass on it. The defendant seems to have died before the contention came up for disposition in the trial court, and hence it was never decided. Senator Charles Sumner, on June 15, 1860, in addressing the Senate, expressed himself on this question in these words:

"I know it is said this power is necessary in aid of legislation. I deny the necessity. Convenient, at times, it may be; but necessary, never. We do not drag the members of the Cabinet or the President to testify before a committee in aid of legislation; but I say, without hesitation, they can claim no immunity which does not belong equally to the humblest citizen. Mr. Hyatt and Mr. Sanborn have rights as ample as if they were officeholders. Such a power as this, which, without sanction of law, and merely at the will of a partisan majority, may be employed to ransack the most distant states, and to drag citizens before the Senate all the way from Wisconsin or from South Carolina, may be convenient, and to certain persons may seem to be necessary. An alleged necessity has, throughout all time, been the apology for wrong.

"'So spoke the Fiend, and with necessity,
The tyrant's plea excused his devilish deeds.'

"Let me be understood as admitting the power of the Senate, where it is essential to its own protection or the protection of its privileges, but not where it is required merely in aid of legislation. The difference is world-wide between what is required for protection and what is required merely for aid; and here I part company with Senators with whom I am proud on other matters to act. They hold that this great power may be exercised, not merely for the protection of the Senate, but also for its aid in the framing of a bill or in maturing any piece of legislation. To aid a committee of this body merely in a legislative purpose, a citizen, guilty of no crime, charged with no offense, presumed to be innocent, honored and beloved in his neighborhood, may be seized, handcuffed, kidnapped, and dragged away from his home, hurried across state lines, brought here as a criminal, and then thrust into jail." Senate Miscellaneous Documents, 2d Sess. 53d Congress, Smith's Precedents, vol. 12, p. 293.

If either branch of Congress has such power, it would seem to follow that the President has such power to aid him in performing his part in the function of legislation. In Kilbourn v. Thompson it was said:

"∗ ∗ ∗ The President is so far made a part of the legislative power that his assent is required to the enactment of all statutes and resolutions of Congress. This, however, is so only to a limited extent, for a bill may become a law, notwithstanding the refusal of the President to approve it, by a vote of two-thirds of each House of Congress."

It will be noted that Wigmore couples the question as to the existence of this auxiliary power in the executive department with its existence in the legislative department. In Anderson v. Dunn it was said:

"The genius and spirit of our institutions are hostile to the exercise of implied powers."

[6] Neither branch of Congress seems ever to have exercised this power—i. e., of compelling an outsider to testify or to produce documents in aid of legislation—except on the occasion out of which the case of Kilbourn v. Thompson arose, and possibly also on the occasion which led to the remarks of Senator Sumner. It cannot, however, be said that the fact that a given power has never been used in either branch of Congress, or that its existence has been unsuspected, is conclusive against its existence, though it may have a bearing on the necessity of its existence. And, in determining whether any given power has been conferred by fair implication, these words in the case of Hepburn v. Griswold, 8 Wall. 613, 19 L. Ed. 513, should be considered:

"The design of the Constitution was to establish a government competent to the direction and administration of the affairs of a great nation, and, at the same time, to mark, by sufficiently definite lines, the sphere of its operations. To this end it was needful only to make express grants of general powers, coupled with a further grant of such incidental and auxiliary powers as might be required for the exercise of the powers expressly granted. These powers are necessarily extensive. It has been found, indeed, in the practical administration of the government, that a very large part, if not the largest part, of its functions have been performed in the exercise of powers thus implied."

But it should be borne distinctly in mind that the question raised here is not as to the power of Congress to compel evidence from outsiders in aid of legislation, but of either branch thereof acting by itself without previous action on the part of Congress. The necessities of this case, however, do not require that I should pass on this question, and I do no more than say that I have very serious doubt as to the existence of such power. This is so because, conceding that the Senate has such power, I am constrained to hold that its action in attempting to compel the petitioner to testify before it is absolutely void. It is urged that such is the case because the investigation was not, at the start, expressly based on the ground that it was in aid of legislation, if such is the case. But I do not find it necessary to determine this question. It will be noted that in the second resolution the Senate has expressly avowed that the investigation is in aid of other action than legislation. Its purpose is to "obtain information necessary as a basis for such legislative and other action as the Senate may deem necessary and proper." This indicates that the Senate is contemplating the taking of action other than legislative, as the outcome of the investigation, at least the possibility of so doing. The extreme personal cast of the original resolutions; the spirit of hostility towards the then Attorney General which they breathe; that it was not avowed that legislative action was had in view until after the action of the Senate had been challenged; and that the avowal then was coupled with an avowal that other action was had in view—are calculated to create the impression that the idea of legislative action being in contemplation was an afterthought. That there is a disposition somewhere in connection with this investigation to stretch things appears from the sweeping demand to produce documents made on the petitioner by the first summons of the Committee. The Supreme Court, in the recent case of Federal Trade Commission v. American Tobacco Co., 44 Sup. Ct. 336,

68 L. Ed. ——, decided the 17th day of March, 1924, said that such a demand is contrary to the "first principles of justice."

Just what other action can be had in contemplation is a problem. Counsel for respondent, in the course of argument, when called on to suggest what other action could possibly be had in contemplation, was not able to shed much light on the problem. I would not be warranted, on the face of things before me, to hold that it is merely to besmirch the former Attorney General and to pillory him, or that there is some other sinister purpose behind the investigation. The only suggestion made by such counsel, as I recall it, of possible other action, was an impeachment of him, without saying where. The only possible place at which it can be thought that there is any purpose to impeach him is at the bar of public opinion. It may be that such is the purpose, and this on the idea that good will result therefrom. This is the most favorable view of the matter that occurs to me, and, because it is, should be taken. But the Senate has no power to impeach any federal officer at the bar of public opinion, no matter what possible good may come of it. It is not within its province to harass, annoy, put in fear, render unfit, or possibly drive from office any such officer, high or low, by instituting such impeachment proceedings against him.

[7, 8] The power to impeach under the federal Constitution resides solely in the House of Representatives, and it has power to impeach solely at the bar of the Senate. The sole power which the Senate has, in the matter of impeachment, is to try such proceedings, so instituted, and it should act therein the part of the impartial judge, and not that of prosecutor. That the Senate has in contemplation the possibility of taking action other than legislation as an outcome of the investigation, as thus expressly avowed, would seem of itself to invalidate the entire proceeding. But, whether so or not, the Senate's action is invalid and absolutely void, in that, in ordering and conducting the investigation, it is exercising the judicial function, and power to exercise that function, in such a case as we have here, has not been conferred upon it expressly or by fair implication. What it is proposing to do is to determine the guilt of the Attorney General of the shortcomings and wrongdoings set forth in the resolutions. It is "to hear, adjudge, and condemn." In so doing it is exercising the judicial function.

The decision of the Supreme Court in the case of Kilbourn v. Thompson is squarely in point, and is a direct authority against the validity of the action of the Senate. This, however, is a stronger case than that case. Here the Senate is not only exercising a judicial function, power to do which is not conferred by the federal Constitution, expressly or by fair implication, but power to do which is impliedly negatived by that Constitution, in its provision conferring the sole power of impeachment on the House of Representatives, and limiting the Senate's connection with such proceedings to trying them. That the Senate should have any such power is against the "spirit and genius" of that instrument. That it is the exercise of a judicial function, which the Senate is engaged in, is not affected by the consideration that exactly what action is in contemplation as the outcome of the investigation

does not appear, no more than, in the case of Kilbourn v. Thompson, the fact that the House of Representatives was engaged in the exercise of a judicial function was not affected by the consideration that it did not so appear there. Nor is the action of the Senate validated by the possibility that from the investigation some suggestion may come of needed legislation, any more than, in that case, the action of the House of Representatives was validated by the possibility that from that investigation some suggestion might come of needed legislation in regard to bankruptcy proceedings. Here, as never, does the end justify the means, nor should evil be done that good may come.

The power of the Senate to investigate the Attorney General's office, or any department of the government, to the fullest extent, is not involved here. In brief of counsel for respondent this is said:

"In order that the legislative function may be performed, properly outside of the court, it must be conceded that the first duty of the Legislature is to properly and fully inform itself. In no matter can this duty be more paramount than in respect to the conduct of the various departments of the government itself. This would seem to be the first and foremost duty. Annually Congress must legislate for the continued support, and therefore for the very existence or ability to continue to function, for all the departments of the Government. To contend that such power and such duty are not present, and inherent and intrinsic, is to say that Congress must pass willy-nilly the money of the people (not their money, nor the money of the departments, but of the people, contributed by enforced taxation). The complaint is generally that too much is spent in that manner as it is, and for the court to deny the power of Congress to inform itself, with the aid of compulsory process to get the information, would not merely be the height of effrontery, but would be destructive."

I hold nothing to the contrary of this. There would seem, however, to be no reason why the information referred to therein cannot be obtained without calling on outsiders. What the Senate is engaged in doing is not investigating the Attorney General's office; it is investigating the former Attorney General. What it has done is to put him on trial before it. In so doing it is exercising the judicial function. This it has no power to do. It has not been conferred expressly. Its existence is negatived by the provisions of the federal Constitution in relation to impeachment proceedings, in view of which there is no possible ground for claiming that it exists by fair implication. As I view the matter, the Senate in its action has usurped judicial power and encroached on the prerogative of the House of Representatives.

There is nothing else for me to do but to adjudge that the petitioner is entitled to his discharge, and a judgment will be entered to that effect.